**GOVERNMENT OF THE VIRGIN ISLANDS**

v.

**VIDAL GALDON AQUINO, Appellant**

**GOVERNMENT OF THE VIRGIN ISLANDS**

v.

**ISHMAEL GUILLERMA REYES, Appellant**

Nos. 16023, 16024

United States Court of Appeals

Third Circuit

Argued February 1, 1967

Filed May 19, 1967

*See, also, 378 F.2d 540*

396

ALPHONSO A. CHRISTIAN, ESQ., Charlotte Amalie, St. Thomas, Virgin Islands, *for appellants*

ALMERIC L. CHRISTIAN, United States Attorney, *for appellee*

Before MARIS, FREEDMAN and COFFIN,* *Circuit Judges*

FREEDMAN, *Circuit Judge*

* Of the First Circuit, sitting by designation.

The defendants, Vidal Galdon Aquino and Ishmael Guillerma Reyes, were jointly tried on two separate informations charging them with rape in the first degree in violation of 14 V.I. Code § 1701(1) and (4).[1] Reyes was found guilty of rape in the first degree and Aquino was found guilty as an accessory after the fact.

The complainant was a stewardess aboard a Norwegian freighter which arrived in St. Thomas at about noon on March 15, 1966. That evening she went for recreation to two nights clubs or bars where she met a number of persons with whom she drank and danced. One of them was Reyes.

Sometime between three and four o'clock on the morning of March 16th, the complainant left the bar to seek a taxi on the main street. A number of witnesses testified that she was intoxicated at the time. While she was waiting a private car driven by Aquino in which Reyes was a passenger pulled up and Reyes offered to take her to her ship. According to her testimony, Reyes attempted to become familiar with her while they were in the car but she resisted him and warned that she would call the police. She remembered nothing thereafter and thought she must have fainted or become unconscious from alcohol. Later in the morning she woke to the barking of a dog and found herself lying almost naked on the ground, her intimate undergarments ripped and out of place on her person. She

---

[1] Section 1701 provides:
 "Whoever perpetrates an act of sexual intercourse with a female not his wife—
 "(1) when through idiocy, imbecility or any unsoundness of mind, either temporary or permanent, she is incapable of giving consent, or, by reason of mental or physical weakness or immaturity or any bodily ailment, she does not offer resistance;
 "(4) when her resistance is prevented by stupor or weakness of mind produced by an intoxicating, narcotic or anaesthetic agent, or when she is known by the defendant to be in such state of stupor or weakness of mind from any cause; . . . "

was hysterical and strangers who came to her assistance called the police, who removed her to the hospital. A medical examination showed the presence of live male sperm in the vagina, although she herself had no recollection of having had sexual intercourse that night and the physician who examined her could not say when the sperm had been deposited.

## I.

Appellants complain of the refusal by the district judge to suppress the statement which Reyes is alleged to have made to Detective Lopez in which he admitted having had intercourse with the complainant, but claimed that it had been voluntary on her part. Since the complainant herself had no recollection of having had intercourse and there was no outside witness to the fact, the admission was the only evidence of his act which, of course, constituted an essential element in the charge of rape. It was damaging in the highest degree to Reyes and thus also to Aquino.

At the trial Reyes denied making the statement. In view of the verdict, however, we must disregard his denial and consider whether the circumstances in which the statement was given violated any fundamental right.

The complainant had identified a suspect at a police lineup, but shortly thereafter informed the police that she had been mistaken. A day or so later she stopped at an eating place and after a few words recognized the man who served her as Reyes. She promptly reported this to the police. Detective Lopez, in the company of Patrolman Heath and Chief of Police Freeman, called on Reyes after Detective Lopez, who knew him, had learned from a car rental agency that he had rented the car which the complainant had entered. It is not clear whether Detective Lopez already knew that the complainant had identified Reyes or made his visit solely because of the identification

of Reyes at the car rental agency. We shall therefore put aside the possibility that the complainant's identification of Reyes had already been conveyed to the officers. While Heath and Freeman waited in the police car, Lopez called on Reyes. He first identified himself by showing him his badge and identification card. Since they already were acquainted, this act obviously must have been intended at least as a reminder of the official nature of Lopez's visit. The conversation began on the subject of the car. Lopez asked Reyes if he had rented the car and Reyes admitted that he had. Then Lopez repeated the original question, but now in a more ominous setting; he said that he was investigating a charge of rape and again asked Reyes if he had rented the car. Reyes again replied that he had. Having thus obtained Reyes' confirmation that it was he who had rented the car involved, Lopez then told him of the gravity of the charge and that he should have counsel. In this indirect way Lopez informed Reyes that he was accused of rape. Reyes replied that he would get a lawyer and said that he would try to communicate with the attorney for his employer. At this point Lopez asked Reyes where his "partner" was. Reyes pointed out Aquino, who was nearby, and Lopez called to him, giving him the same advice as to the seriousness of the charge and the need for counsel. Thus ended the portion of the discussion between Lopez and the appellants which was preliminary to bringing them to the police station.

When appellants entered the police car, further discussion ensued between Lopez and Reyes in Spanish, which the other two officers did not understand. Lopez explained to Reyes in Spanish what the complainant had reported to the police and it was evidently then that according to Patrolman Heath, Chief of Police Freeman asked that they speak in English. At this point, when the conversation was in English, Reyes, without having been asked any ques-

tion on the subject, responded to Lopez's statement of the complainant's claim by saying that the sexual intercourse between them was voluntary on her part. Lopez thereupon asked Reyes why he had thrown her out of the car if she had voluntarily consented to intercourse, and Reyes replied that she had not wanted to get out and the hour was late. According to Patrolman Health, Lopez then asked the Chief of Police if he wanted to know any more and the Chief of Police replied that he did not and advised Reyes that when they got to the police station he should get in touch with an attorney, and that he was not required to make any further statements unless he wanted to do so on his own.

■ The police clearly exercised no coercion, physical or psychological, upon Reyes in order to obtain his statement, beyond that which was inherent in the notification that he was involved in the grave charge of rape and in the recital of the complainant's claim. Cases which view confessions in circumstances of physical or psychological coercion (see Davis v. North Carolina, 384 U.S. 737 (1966)) therefore are not here relevant. Also inapplicable is the doctrine of Miranda v. Arizona, 384 U.S. 436 (1966) that the failure to give adequate notice, inter alia, of the rights to remain silent and to have the services of counsel renders a harmful admission inadmissible against the declarant by a kind of conclusive presumption of involuntariness. The trial in this case began on May 17, 1966 and Miranda therefore does not apply. Johnson v. New Jersey, 384 U.S. 719 (1966). We are, however, within the intermediate zone governed by Escobedo v. Illinois, 378 U.S. 478 (1964), since the trial here began after that decision. Johnson v. New Jersey, supra.

■ The limited reach of Escobedo is best stated in the words in which the Court summarized it: "We hold, therefore, that where, as here, the investigation is no longer a

general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S., at 342, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (490–91.) See Johnson v. New Jersey, supra, at 733–34. See generally Developments in the Law—Confessions, 79 Harv. L. Rev. 935, 999–1023 (1966).

The facts leave no room for doubt that the investigation here had begun to focus on Reyes at the time Lopez and the other officers came to take him to the police station. It is equally clear that Reyes had been taken into police custody, for the police were transporting him in a police car to the police station. It is also clear that he had indicated that he wished to consult with counsel and that he had been giving no warning whatever of his constitutional right to remain silent before he had consulted with him. The only question which remains is whether the police were carrying on a process of interrogation that lent itself to eliciting incriminating statements.[2]

The government asserts in effect that there was no process of interrogation under way, but that instead a sympathetic officer who had come to take Reyes to police headquarters thought it elementary justice to inform him what the complainant had charged against him and that

---

[2] See generally Developments in the Law—Confessions, supra, at 1007–1012, 1021.

Reyes on hearing it had spontaneously blurted out what he thought was an exculpatory statement, but which turned out to be an essential link in the proof of his guilt. Reyes did not know that in law intoxication deprives a victim of the capacity to consent,[3] and there can be no doubt that his admission of sexual intercourse with the complainant was made in the belief that this absolved him of the charge of rape, although ultimately he was cruelly disappointed in this. This admission, however, was not made without any prompting by the police.[4] Not only had Detective Lopez implicitly challenged Reyes to deny the charge by detailing the alleged offense, but he had also previously questioned him as to whether he had rented the car, a piece of important circumstantial evidence, and as to the identity of his "partner." That Lopez's statement was not a simple, friendly explanation which would inform Reyes why he was being taken to the police station is clear from the fact that he had already told the appellants before they had entered the car that the charge involved was rape. To state this in further detail to one who had already admitted the rental of the car was not to furnish him orally with a bill of particulars, but rather to provoke him to deny or admit the accusation against him.[5] That this was the subjective attitude of Lopez as well as the objective result of it is confirmed by what immediately followed. For after Reyes had innocently convicted himself of intercourse, even as he thought he was disproving the charge of rape by saying that it was voluntary on the part of the complainant, Lopez asked why he had thrown

[3] Similarly, Escobedo thought he was exculpating himself of guilt by accusing his accomplice of the actual shooting, not knowing that under Illinois law a mere participant was equally guilty.

[4] Compare United States v. Drummond, 354 F.2d 132, 141 (2 Cir. 1965), cert. denied, 384 U.S. 1013 (1966); Long v. United States, 338 F.2d 549 (D.C. Cir. 1964).

[5] Cf. Escobedo v. Illinois, supra at 485–86, quoting Bram v. United States, 168 U.S. 532, 562 (1897).

her out of the car. Here there is no indication of an innocent effort by an officer to put a defendant on his guard or to supply him with knowledge of what is charged against him. It was an argumentative challenge of the truth of what Reyes had said and was no less than cross-examination. It contradicted Reyes' claim of consensual intercourse and probed him with the barb that his conduct in throwing the complainant out of the car would discredit his defense.

Thus, what occurred was a psychological trap by which a description of the charge of rape produced a claim of innocence which had loaded in it by the admission of sexual intercourse, the one element which the complainant herself could not provide. The presentation to the jury of the statement regarding the brutal eviction of the victim not only forged the final link in the chain of Reyes' guilt, but added an element of moral indignation at his offensive conduct after the intercourse occurred, a factor which must have made the jury all the more unsympathetic to his claim of innocence.

Moreover, the government's claim that Lopez had sympathetically counseled the appellants in Spanish so that the other police officers would not understand their conversation is unsupported by the testimony in so far as it deals with the crucial portions of the conversation. For it was after the conversation had turned to English that the critical admission was made. Finally, the testimony of the other officers shows that they believed the right to remain silent and to secure the services of counsel did not come into full play until the appellants had arrived at the police station.

From these circumstances it clearly appears that seriously incriminating information was obtained by questioning Reyes, who was arrested later that day on the charge of rape, that no notice was given to him that he had the

right to remain silent, that the questioning proceeded while he was in the custody of the police even though he had been informed that the charge was grave and he should have counsel, and that he had not been given an opportunity to secure counsel before reaching the police station, even though he had indicated that he wished to secure an attorney. The case therefore falls within the principle of Escobedo. It is true that here there was no express denial of a request to consult with a lawyer, as there was in that case. Nevertheless, the press of continued discussion with Reyes regarding the nature of the charge after he had told the police that he wished to have counsel and when he had not yet had the opportunity to secure his services, as effectively deprived him of his right to counsel as would a specific denial of a demand for counsel. There is nothing to indicate any intention by Reyes to waive or abandon the right to the assistance of counsel when the continued interrogation occurred. This deprivation by questioning him after knowledge that he desired the assistance of counsel is sharpened by the failure of the police to give him any warning of his right to remain silent.[6]

Because Reyes' statement was illegally obtained, the judgement of conviction against him will be reversed and a new trial awarded. Since Reyes must be retried, it is necessary to consider his further claim that the district court erred in admitting in evidence the testimony which the complainant gave at the preliminary hearing. This is an important issue under the Sixth Amendment and the Virgin Islands Bill of Rights.

## II.

Appellants attack the district court's action in admitting into evidence and permitting to be read to the jury the

---

[6] See Commonwealth v. Jefferson, 423 Pa. 541, 226 A.2d 765 (1967), holding that any admission elicited by the police before warning a suspect of his right to remain silent violates the rule of Escobedo.

transcript of the testimony which the complainant gave at the preliminary hearing before a judge of the municipal court acting as a committing magistrate, where she was subjected to cross-examination by the same counsel who later represented them at the trial. They allege that this violated their constitutional right to confront the witnesses against them, guaranteed by the Sixth Amendment and by the identical provision in the Bill of Rights of the Revised Organic Act of the Virgin Islands,[7] both of which provide: "In all criminal prosecutions the accused shall enjoy the right . . . to be confronted with the witnesses against him."

The complainant's testimony, which was read to the jury in her absence, seriously affected appellants' rights. Although she had acknowledged that she had no recollection of having had intercourse, she had identified the appellants and claimed that she had entered their car and was with them until she lost knowledge of her surroundings shortly after Reyes had made amorous advances to her which she had rejected. Her testimony also contained admissions by Reyes that he had torn her clothing, for which he had offered to pay, and had thrown her out of the car.

The right of confrontation, literally construed, would destroy all exceptions to the hearsay rule and would require the exclusion of all prior statements. But it has always been recognized that the right of confrontation is not absolute, even in instances where, as in some states, the constitutional provision is cast in terms of a right to meet the witness "face to face."[8] The constitutional guarantee has been limited to the assurance of the right of cross-examination of the witness before his testimony may be used at a later trial. See, e.g., Pointer v. Texas, 380 U.S. 400 (1965); Douglas v. Alabama, 380 U.S. 415 (1965). It has been widely recognized, however, that in addition to the

---

[7] Section 3, 1 V.I. Code Annot. CII, 48 U.S.C. § 1561.
[8] E.g., Commonwealth v. Gallo, 275 Mass. 320, 175 N.E. 718 (1931).

benefit which a defendant has in testing the reliability of a witness against him by cross-examination, confrontation ordinarily secures a secondary advantage in making it possible for the tribunal before whom the witness appears to judge from his demeanor the credibility of his evidence. This advantage results, not from the confrontation between the witness and the accused, but from the witness's presence before the tribunal. See 5 Wigmore, Evidence, (3d ed. 1940), § 1395; McCormick, Evidence (1954), § 231, p. 484. In Mattox v. United States, 156 U.S. 234, 242–43 (1895), the Supreme Court early recognized these two benefits which confrontation confers on a defendant in a criminal case: "The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

Demeanor is of the utmost importance in the determination of the credibility of a witness. The innumerable telltale indications which fall from a witness during the course of his examination are often much more of an indication to judge or jury of his credibility and the reliability of his evidence than is the literal meaning of his words. Even beyond the precise words themselves lies the unexpressed indication of his alignment with one side or the other in the trial. It is indeed rarely that a cross-examiner succeeds in compelling a witness to retract testimony which is harmful to his client, but it is not infrequently that he leads a hostile witness to reveal by his demeanor—his tone of voice,

the evidence of fear which grips him at the height of cross-examination, or even his defiance—that his evidence is not to be accepted as true, either because of partiality or over-zealousness or inaccuracy, as well as outright untruthful-ness. The demeanor of a witness, as Judge Frank said, is "wordless language." Broadcast Music, Inc. v. Havana Madrid Restaurant Corp., 175 F.2d 77, 80 (2 Cir. 1949).[9] It is in recognition of the superior advantage which observation of the demeanor of the witness confers on the fact finder that a reviewing court must accept as true whatever evidence supports the verdict of a jury and that in trials without a jury Rule 52(a) of the Federal Rules of Civil Procedure provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

The significance of demeanor evidence reaches heightened importance on a charge such as rape, for there is now widespread recognition of the special psychological elements inherent in charges of sexual abuse. Special caution must be exercised in such cases, and the credibility of the complainant is of crucial importance.[10]

■ Although demeanor evidence is in reality of such high significance, it is nevertheless well settled that it is not an essential ingredient of the confrontation privilege; the privilege is satisfied if the defendant is accorded the right of cross-examination. See Pointer v. Texas, 380 U.S. 400 (1965); Douglas v. Alabama, 380 U.S. 415 (1965).[11]

---

[9] See also Judge Frank's opinions in N.L.R.B. v. Dinion Coil Co., 201 F.2d 484 (2 Cir. 1952) and Arnstein v. Porter, 154 F.2d 464 (2 Cir. 1946).

[10] See 3 Wigmore, Evidence (3d ed. 1940), §§ 924a, 934a.

[11] Only in cases clearly within the well recognized exceptions to the hearsay rule, such as dying declarations, has the Supreme Court allowed evidence to be admitted against a criminal defendant where there had been no opportunity to cross-examine the declarant. See, for a challenge to even this limited exception, Note, Preserving the Right to Confrontation —A New Approach to Hearsay Evidence in Criminal Trials, 113 U.Pa.L. Rev. 741, 749–51 (1965).

That the opportunity for cross-examination at the time the original testimony was taken is the essence of the constitutional guarantee of confrontation was early recognized by the Supreme Court in Mattox v. United States, supra, where the testimony of a witness at a prior trial at which there had been full cross-examination was admitted at a subsequent trial because of the witness's death. The Supreme Court said: "There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards [of cross-examination and the jury's opportunity to judge the witness's credibility by his demeanor on the stand] even by the death of the witness; and that, if notes of his testimony are permitted to be read, he is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law in its wisdom declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused. . . .

"The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination." (243–44).

■ The rule permitting the introduction of the prior testimony of a witness who had been subject to cross-examination has been applied not only to testimony given at a prior trial, but also to testimony given before a com-

mitting magistrate at a preliminary hearing.[12] Were the question one of first impression it would seem that a clear distinction should be recognized between testimony given at a prior trial and testimony given at a preliminary hearing. In the case of a prior trial the goal of the cross-examiner is precisely the same as that which he would have followed at the second trial—acquittal of the defendant. At the preliminary hearing, however, the cross-examiner is much more narrowly confined by the nature of the proceeding. The government's aim is merely to show a prima facie case and its tactic is to withhold as much of its evidence as it can once it has crossed that line. The fear of adding to the government's case by extensive cross-examination weighs heavily on a defendant's counsel at a preliminary hearing, where much of the government's case remains still in doubt. The cross-examiner therefore is in a far different position than he would be at trial, where the government must go beyond its prima facie case to convince the jury of the defendant's guilt beyond a reasonable doubt. Everyday experience confirms the difference, for it is rare indeed that on a preliminary hearing there will be that full and detailed cross-examination which the witness would undergo at the trial. Credibility is not the issue at a preliminary hearing as it is in a trial. All the arts of cross-examination which are exerted to impair the credibility of a witness are useless in a preliminary hearing. Nevertheless, we must accept for present purposes the rule which makes no distinction between testimony given at a prior trial and the testimony given at a preliminary hearing.

■■ The question remains, however, under what circumstances prior testimony of an absent witness who was

---

[12] Among the many cases where the testimony had been originally given at a preliminary hearing and not at a trial, see e.g., West v. Louisiana, 194 U.S. 258 (1904); Motes v. United States, 178 U.S. 458 (1900).

412

subject to cross-examination may be introduced into evidence at a trial. The rule has been long settled that this may be done only where the witness is unavailable at the time of the trial because of his death, insanity, illness, absence beyond the jurisdiction, or because he was kept away by the connivance of the other party.[13] The requirement that such unavailability be shown exists under the constitutional requirement of confrontation and equally so as a rule of evidence, since the declarant's testimony ordinarily is inadmissible as hearsay and can be admitted at the subsequent trial only out of necessity as an exception to the hearsay rule. See Motes v. United States, 178 U.S. 458 (1900); Washington v. Holman, 245 F.Supp. 116, 122–23 (M.D.Ala. 1965), aff'd on this point, 364 F.2d 618, 622–24 (5 Cir. 1966).

The court below refused the motion of appellants to exclude the transcript of the complainant's testimony at the preliminary hearing which was offered at the trial on the ground that she was then unavailable. This action was under 5 V.I. Code § 932(3)(b)(ii), taken from the Uniform Rules of Evidence, which permits such testimony "if the judge finds that the declarant is unavailable as a witness at the hearing, . . . when . . . the issue is such that the adverse party on the former occasion had the right and opportunity for cross examination with an interest and motive similar to that which the adverse party has in the action in which the testimony is offered." This provision does not define unavailability of a witness, and its draftsmen left open its constitutionality in criminal cases.[14]

---

[13] 5 Wigmore, Evidence (3d ed. 1940), §§ 1396, 1401–18; McCormick, Evidence (1954), § 231, at pp. 484–85; Note, 113 U.Pa.L.Rev. 741, 757 (1965).

[14] Section 932(3) dealing with depositions and prior testimony is taken from Rule 63 of the Uniform Rules of Evidence on which the Commissioners made the following comment: "A question may be raised with respect to the use of former testimony by the prosecution in a criminal case, whether such use would violate the right of the accused to be confronted by his witnesses. As in several other areas, the constitutional question may or may not be a barrier to the use of the testimony. We are dealing in this

In determining whether unavailability was shown, it is necessary to consider closely the nature of the doctrine, repeated in innumerable cases, that the absence of the witness from the jurisdiction and his consequent immunity from subpoena sufficiently establishes his unavailability.[15] The foundation for the rule is that a witness who is beyond the jurisdiction is as unavailable to the party who wishes to call him as if he were dead. Since he is beyond the power of subpoena in the jurisdiction where the trial is to be held, his testimony could be produced afresh only by taking his deposition, which it would be idle to prefer over the already recorded transcript of the prior trial. Absence beyond the service of a subpoena, however, is not a full answer to the question. There may be cases in which the witness might be willing to come into the jurisdiction to testify if his expenses of travel are paid. Is it enough, then, merely to prove that the witness is beyond reach of subpoena, without showing any effort to secure his voluntary return and without any indication that if he had been asked he would have refused to do so?

Recent statutory developments suggest a negative answer. The Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, has been adopted in forty-five states, the District of Columbia and in three territories including the Virgin Islands.[16] Section 3 permits a judge of a court of record in one jurisdiction to certify that in a prosecution pending before the court a material witness will be required for a specified number of days and is in any jurisdiction which has a reciprocal law. Thereupon, on presentation of the certifi-

---

rule with the question of hearsay and with that subject only." Comment of Commissioners to 5 V.I. Code, § 932, at 1 V.I. Code Annot., p. 466.

[15] See West v. Louisiana, supra; Commonwealth v. Gallo, supra. Numerous cases are collected in 5 Wigmore, Evidence (3d ed. 1940), § 1404.

[16] 5 V.I. Code §§ 3861–65. See 9 Uniform Laws Annot. 49 (1966 Supp.). See generally Annotation, Uniform Act to Secure Attendance of Witnesses from Without a State in Criminal Proceedings, 44 A.L.R.2d 732 (1955).

cate to a judge of a court of record in the county where the witness is found, the witness may be required to testify in the first jurisdiction if he is tendered the statutory travel expenses and compensation and daily subsistence. With the prevalence of such a statute, there is now recognition of both the power and the desirability of requiring a witness to come from one state to another to testify in a criminal proceeding. The question would be rendered acute in the present case if the complainant were now a resident in one of the states of the United States which has a reciprocal law; even without such a law, however, Rule 17(e) of the Federal Rules of Criminal Procedure, which is applicable in the Virgin Islands,[17] provides for service of a subpoena upon a witness at any place within the United States, or, if the witness is a resident of the United States, even in a foreign country. Here, however, the witness apparently is not a citizen or resident of the United States, but a Norwegian.[18] But even if the Uniform Act and the Rule of Criminal Procedure are both inapplicable, they nevertheless indicate the modern recognition of the desirability of securing the attendance of witnesses who are outside the jurisdiction where the trial is held and the fairness of requiring the payment of the travel and per diem subsistence of the witness by the party who calls him.

We turn then to the facts which appear in the record to determine whether they justify the finding by the district court that the witness was truly unavailable.

At the preliminary examination seven days after the crime had been committed, complainant testified that this had been her first position as a stewardess on a vessel.

---

[17] Federal Rule of Criminal Procedure 54 (a)(1).

[18] The record discloses only that she was a stewardess on a Norwegian vessel; her citizenship has not been precisely described.

The ship evidently had departed, for she said that it was to sail at 8 o'clock on the morning the offense occurred, and at the time of her testimony she was living at a guest house in the Virgin Islands. At the trial, which began on May 17, 1966, the prosecutor said that she had taken another ship and had returned home, and apparently that she was not within the jurisdiction of the court because its process could not reach her either on the high seas or in Norway, "wherever she might be." Appellants' counsel at one point said that he had understood from an earlier discussion that the only question was whether the government would be willing to bear the expense "of trying to get her here." The government's counsel, however, denied that such a statement had been made.

 So far as the record shows, therefore, the complainant might have been residing continuously in the Virgin Islands ever since the preliminary hearing was held. She might have been aboard a vessel which was in St. Thomas harbor at the time of the trial. In these circumstances it cannot be said that the prosecution satisfactorily established the burden which rested on it to show that she was unavailable at the time of trial. We hold therefore that the finding by the district court that the complainant was unavailable to the government as a witness is not supported by the record and is clearly erroneous.

 On retrial, if the complainant is shown to be beyond the jurisdiction of the court there will remain the question of what the government must show to prove that she is actually unavailable. We believe that in such a case, especially where the absent witness is the complaining party, the government must show diligent effort on its part to secure the complainant's voluntary return to testify. See, e.g., State v. Weinrib, 140 Conn. 247, 99 A.2d 145 (1953). The Virgin Islands are a center for tourists who may become important witnesses in actions brought

there. It is important, if the transcripts of their testimony in prior proceedings such as preliminary hearings are to be presented at subsequent trials when they are no longer present in the Islands, that a full and adequate foundation be laid to justify the admission of the evidence. As the increasing popularity of the Virgin Islands as a vacation resort attests, travel over long distances is relatively swift and easy today. We may not exclude the important evidence of demeanor without realistically taking into consideration the opportunity which air travel now affords for bringing witnesses from long distances into the Virgin Islands to testify. The new procedures under the Uniform Act and the broad provisions of the Federal Rules of Criminal Procedure make possible the compulsory attendance of witnesses who are outside the jurisdiction. The reasonableness of efforts to secure attendance in the Virgin Islands of a witness, whether he is in another state of the Union or in a foreign country, must be judged by the standards of modern air travel and not of the sailing vessel or even the steamship. Where the liberty of a defendant is at stake the government which prosecutes him may not secure the benefit of incriminating testimony against him unless it shows its genuine and bona fide effort to secure the attendance of the witness. An effort which expires at the shoreline of the Virgin Islands cannot be said to have inherently in it the proof of its genuineness and its bona fide character. No effort can be deemed genuine and bona fide which is not reasonable in its extent, and reasonableness must be judged, not by artificial boundaries, but by limitations of time and distance.

It may be that on a retrial the government will prove its inability to ascertain the whereabouts of the complainant or to secure her attendance. If the government ascertains her whereabouts it would be required to reimburse her for her expenses of travel and subsistence if

this is necessary in order to secure her voluntary appearance in the Virgin Islands. If the government should be unwilling to reimburse her because it deems her demand excessive, the reasonableness of its refusal would be determined by the trial judge at the time the government offers her prior testimony in evidence on the ground of her unavailability. Such a determination would call upon the exercise of a wise judicial discretion, which would take into consideration the significance of the particular witness's physical presence, the funds available to the prosecution, and the trial judge's familiarity with the financial abilities of the government and the frequency with which requirements for reimbursement may be made. On the present record, however, it is impossible to determine whether this element of expense will assume any significance, for the record does not disclose what requirements the government might be required to meet in order to secure the complainant's voluntary attendance if she is beyond the reach of subpoena.

## III.

The final question is whether Aquino, who was tried on an information charging him as a principal, could be convicted as an accessory after the fact. At the conclusion of the evidence, counsel for the government urged the jury in his summation to find Aquino guilty as an accessory after the fact in the event they did not believe him to be guilty as a principal. The jury in its verdict expressly found Aquino "guilty of the lesser crime, to wit accessory after the fact."

The government argues that the conviction should be sustained because the caption of the information refers to § 11 of 14 V.I. Code. This section, however, deals with principals and eliminates in the Virgin Islands the distinctions between principals in the first and second degree and

accessories *before* the fact, as has been done in modern state statutes. The citation in the caption of the information therefore is of no help to the government in sustaining the conviction of Aquino as an accessory *after* the fact.

The distinction between an accessory after the fact who is defined in § 12 of 14 V.I. Code, and an accessory before the fact, who is made a principal under § 11, is made clear both in the separate definitions of the offenses and by the limitation of the punishment of the accessory after the fact to one-half that of the accessory before the fact, who is punished as a principal.[19] Section 11(a) makes punishable as a principal whoever "commits a crime or offense or aids, abets, counsels, commands, induces or procures its commission . . . ," while § 12(a) defines an accessory after the fact as one who, "knowing that a crime or offense has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment. . . ."

In obliterating the common law distinctions between principals in the first and second degree and accessories before the fact, these statutory provisions have specifically retained the fundamental distinction between an accessory before the fact—now a principal—and an accessory after the fact. This distinction survives the reason for the modernization of the difference between principals in the first and second degree and accessories before the fact, for it rests upon a substantive difference in the nature of the criminal conduct involved. An accessory after the fact is one who, knowing that a crime has been committed, obstructs justice by giving comfort or assistance to the offender in order to hinder or prevent his apprehension or punishment.[20] The offense thus can occur only

---

[19] 14 V.I. Code § 12(b), following 18 U.S.C. § 3.

[20] Bishop's definition is: "An accessory after the fact is one who, knowing a felony to have been committed, harbors the felon, or renders him any

after the substantive crime has been committed and is in no way an element of the crime. This fact should prevent any confusion between the "aiding and abetting" by the accessory before the fact who is made a principal under § 11(a), and the "relieving, comforting or assisting" of the offender by an accessory *after* the fact under § 12. The "aiding and abetting" of the offender under § 11, which makes the accessory before the fact a principal, deals with aiding and abetting in the commission of the crime; it renders him punishable as a principal as if he himself had committed the crime. On the other hand, "comforting and assisting" the offender, which makes one an accessory after the fact under § 12, does not relate to assistance in the commission of the crime, but rather to assistance rendered the offender in order to hinder or prevent his apprehension or punishment after he has already committed an offense.[21]

The giving of refuge or other assistance in escaping punishment to one who has committed a crime bears no relation to the ingredients of the substantive crime. By definition, an accessory after the fact is one who stands outside the commission of the substantive crime, for his offense consists of what he does, after he knows it has been committed, to aid the offender to avoid apprehension or punishment.

---

other assistance to elude punishment." 1 Bishop, New Commentaries on the Criminal Law (8th ed. 1892) § 692. See also § 695.

[21] "And, generally, any assistance whatever given to a felon, to hinder his being apprehended, tried, or suffering punishment, makes the assistor an accessary [after the fact]. As furnishing him with a horse to escape his pursuers, money or victuals to support him, a house or other shelter to conceal him, or open force and violence to rescue or protect him. So likewise to convey instruments to a felon to enable him to break gaol, or to bribe the gaoler to let him escape, makes a man an accessary to the felony." IV Blackstone, Commentaries, *37–8. It is for this reason, Blackstone points out, that one who receives stolen goods knowing them to be stolen could not be punished as an accessory after the fact, because he only received the stolen goods and did nothing to receive the felon. IV Blackstone, Commentaries, *38.

█ It is in recognition of this clear distinction that one who is indicted as a principal may not be convicted as an accessory after the fact.[22] As early as Blackstone's time it was conversely recognized that "one acquitted as principal may be indicted as an accessory after the fact; since that is always an offense of a different species of guilt, principally tending to evade the public justice, and is subsequent in its commencement to the other." IV Blackstone, Commentaries, *40.

██ The government urges, however, that the conviction is proper under Rule 31(c) of the Federal Rules of Criminal Procedure which provides: "The defendant may be found guilty of an offense necessarily included in the offense charged. . . ." This Rule does not lay down a novel principle of law; it carries out the settled principle that there may be a conviction of a crime which is necessarily included within the higher offense charged. Thus it has been recognized under the Rule that the lesser offense must be such that it is impossible to commit the greater offense without having first committed it.[23] To give assistance in avoiding apprehension or punishment of a crime knowing that it has been committed has nothing in common with the elements essential to establish a charge of rape.

█ Moreover, a serious question is raised by the Virgin Islands Bill of Rights, which confers on a criminal defendant in the Virgin Islands, just as does the Sixth Amendment, "the right . . . to be informed of the nature and cause of the accusation."[24] One who is charged with having committed the offense of rape can hardly know that

---

[22] State v. Sullivan, 77 N.J. Super. 81, 185 A.2d 410 (1962); Hill v. State, 221 Ga. 65, 142 S.E.2d 909 (1965); Wilson v. State, 94 Ga. App. 588, 95 S.E.2d 733 (1956); see People v. Galbo, 218 N.Y. 283, 112 N.E. 1041 (1916).

[23] Larson v. United States, 296 F.2d 80 (10 Cir. 1961); Giles v. United States, 144 F.2d 860 (9 Cir. 1944); United States v. Ciongoli, 358 F.2d 439 (3 Cir. 1966). See also Sansone v. United States, 380 U.S. 343, 349–50 (1965); Berra v. United States, 351 U.S. 131 (1956).

[24] Revised Organic Act, § 3, 1 V.I. Code Annot. CII.

he should prepare a defense to a claim that he had assisted someone else, who had committed the crime, to avoid apprehension or punishment.[25] Such a difference between the charge and the verdict involved the substantive rights of Aquino and is not a variance which could be eliminated by a simple amendment authorized by Rule 7(e) of the Federal Rules of Criminal Procedure.[26]

Aquino therefore was convicted of a crime which had not been charged against him and which was not a lesser offense necessarily included within the charge against him. His conviction therefore must be set aside. In doing this we express no opinion, however, on the question whether the evidence against him would support a conviction on an information charging him as an accessory after the fact.[27]

In Reyes' appeal (No. 16024) the judgment will be reversed and a new trial awarded. In Aquino's appeal (No. 16023) the judgment will be reversed with direction to enter a judgment of acquittal.

---

[25] See Russell v. United States, 369 U.S. 749, 763–66 (1962); Stirone v. United States, 361 U.S. 212, 215, 217 (1960).

[26] Rule 7(e) provides: "The court may permit an information to be amended at any time before a verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced."

[27] Compare Smith v. United States, 306 F.2d 286 (D.C.Cir. 1962).