**STATE of Missouri, Respondent,**

v.

**Tommy Lee BRADFORD, Appellant.**

No. 53684.

Supreme Court of Missouri,
Division No. 2.

Nov. 12, 1968.

Motion for Rehearing or Transfer to Court En Banc Denied Dec. 9, 1968.

Norman H. Anderson, Atty. Gen., Jefferson City, James R. Reinhard, Sp. Asst. Atty. Gen., Paris, for respondent.

John C. Boyd, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, for defendant-appellant.

BARRETT, Commissioner.

A jury found Tommy Lee Bradford guilty of robbery by means of a dangerous and deadly weapon and fixed his punishment at fourteen years' imprisonment. Upon motion for new trial "or in the alternative for reduction of punishment" the court reduced the punishment to seven years' imprisonment and, after filing a written waiv-

er of his right to appeal, he has nevertheless appealed.

■ The circumstances of the robbery, as testified to by the victim, were that on Saturday evening, May 28, 1966, Reuben Harris, a filling station worker, spent some time in a tavern at Whittier and Hodiamont. When he finally walked outside, intending to get in his parked automobile, two men approached, "their face looked familiar," and asked if they could "ride down to Whittier and Easton with me." Harris agreed and both men got in the front seat of his 1963 Buick Photo Electra 235, bearing Missouri license KBO–664. When the automobile approached the designated area Bradford "tried to get me to carry him some place else down through some alley or other" and by then, he said, he "knew something was wrong" and Bradford "stuck a knife in my side." Bradford said "to give him the money that I had in my pocket" but Harris denied that he had money. Finally Harris "hit the handle of the door and came out, come out of it from up under the driver's side," Bradford grabbed him by the collar and "this other fellow came on around and they both wrestled me down." Both men kicked him, fracturing his ribs, "I seen that they was going to kill me or something" and took $43.00 from his pants pocket. As Harris scrambled toward the lights of another automobile the appellant and his companion, Hubbard, "got in my car and taken off." Harris made an in-court identification of Bradford as one of his assailants, the one with the knife, and these circumstances, needless to say, refute his claims that the state did not prove his guilt beyond a reasonable doubt or that "The evidence was insufficient to support the verdict." State v. Smith, Mo., 298 S.W.2d 354; State v. Preston, Mo., 184 S.W.2d 1015.

Harris' 1963 Buick, Missouri license KBO–664, was recovered in these circumstances: Between 3 and 4 o'clock a. m., on May 30, 1966, patrolman Hatcher of the Meridian, Mississippi, police force saw the automobile near a closed shopping center. Hatcher and fellow officers noted the out-of-state license tag and "we knew anybody shouldn't be around at that time" and so they decided to "check it (the car) out." When Hatcher approached the automobile he saw two people in it, Bradford in the rear seat and Hubbard, whom he had known since childhood, in the front seat. Upon the principal objection urged here this is the direct examination of Officer Hatcher:

"Q. * * * Now, did he (Bradford) at any time state anything to you regarding this automobile?

"A. He did in questioning and trying to determine what they were doing there, and they admitted that—he did—that they took the car from Missouri—from a man in Missouri."

On cross-examination the only question important here was:

"Q. Now, how long was—did your questioning last?

"A. Didn't last any longer than it took to determine that they didn't have sufficient identification to prove ownership of the car."

Whereupon they were arrested and delivered to the detective bureau of the Meridian police department.

Prior to the trial there was a hearing before the court on the admissibility of any confession Bradford may have made to Hatcher and there more details of the investigation and eventual arrest were given. On direct examination:

"Q. Do you recall any statement Mr. Bradford made to you or to your fellow officers while he was still in this car?

"A. He did. He made two or three statements to different people that owned the car because he and the other guy either one couldn't make an identification of them owning the car, and finally admitted that they took the car from some fellow in Missouri.

"Q. All right. Now, was this statement that they had taken the car from somebody else in Missouri made while they were still in the car?

"A. Yes, sir.

"Q. Had you placed anybody under arrest or taken anybody into custody at that time?

"A. No, sir.

"Q. Had either you or any of your other officers told either of the occupants that they were then under arrest for any violation of the law?

"A. Not up until that time. After then we placed them under arrest."

On cross-examination these were the pertinent questions to and answers by Officer Hatcher:

"Q. Officer Hatcher, did you tell the defendant, Bradford, that any statements he made could be held against him?

"A. No, sir. I didn't ask him for any statement.

"Q. Did you tell him that he had a right to have a lawyer when you took him in?

"A. We placed him under arrest and carried him to the City Hall. We didn't question him any further on anything.

"Q. You placed him under arrest at the site of the shopping center?

"A. Yes, sir.

"Q. And is it your statement that he merely volunteered this information?

"A. He did. He couldn't show proof of the automobile and he just up and said he took it."

\*   \*   \*   \*   \*   \*

"Q. Now, are you sure which of the defendants made any statements?

"A. Both defendants—both Ernest Hubbard and Tommy Lee Bradford said that they took the car. They didn't make any statement. We didn't ask for any statement. They just said they took the car from a man in Missouri."

In further clarification Officer Hatcher gave this answer in response to a question from the court:

"A. He (Hubbard) told me some fellow's name, and then Mr. Bradford in the back spoke up and said it belonged to somebody else, and the two names conflicted, so we asked for identification papers on the car which they didn't have."

Pointing to all these circumstances appellant's diligent court-appointed counsel very earnestly argues that the court prejudicially erred in permitting Officer Hatcher to testify to "said alleged confessions" or admissions. It is said that the admissions were elicited "during custodial interrogation," that Bradford had not been warned of his right against self-incrimination, that is, to remain silent or of his right to counsel and that therefore his state and federally protected constitutional rights had been infringed with the consequence that he is entitled to a new trial. These arguments are made in great detail, point by point, but it is not necessary to detail them, it is sufficient to say that the appellant contends that the circumstances fall within and are governed by Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974; Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882; and numerous other related cases. There have been no precisely similar Missouri cases and therefore both the state and the appellant rely, appropriately in this instance, on cases from other jurisdictions. The circumstances in this particular case are so aptly illustrative of a type of permitted police investigation and incriminating admissions or confessions, within the meaning of the above noted cases, that they have been set forth in their precise context and in detail. And in this

connection it is not necessary here to quote from, distinguish and illustrate from the Miranda decision, that is well-done in the seven cases relied on by the parties.

In Commonwealth v. Jefferson, 423 Pa. 541, 226 A.2d 765, relied on by the appellant, a police officer entered a hospital room and said, "What happened?" The defendant, apparently in a room with others, replied: "There was a fight. * * * They jumped me and I stabbed them." Subsequently, some minutes perhaps, a second police officer appeared, entered the hospital room and said, "Who did the stabbing?" The appellant raised her hand and said, "I did. I think I got the wrong one." Analyzing and illustrating from the Miranda and other cases the Pennsylvania court pointed out that as to the first officer's interrogation his question was directed to all present, he did not know whether any of them had committed a crime and the defendant's "response was truly a volunteered, spontaneous, freely-made utterance to general questioning of citizens in the police fact-finding process" and, therefore, the court said, "The evidentiary use of such volunteered statements is in no way affected by either Miranda or Escobedo." But as to the second officer's questions and the appellant's response, the court said that by then "the investigation had certainly begun to focus on her as the accused" and she was at least technically "in custody" and in reversing and remanding the case the court pointed out the difference in the two circumstances: "However, when the statements were made in response to questions of Officer Zevtchin, a new situation had arisen. As of then, Zevtchin knew there had been a stabbing and Jefferson was, by her own admission, the perpetrator. She should immediately have been advised of her right to remain silent before further questioning ensued, and such warning not having been given renders her statements made from that point on constitutionally inadmissible." In the other case relied on by the appellant, Government of Virgin Islands v. Aquino, 3 Cir., 378 F.2d 540, a rape case involving two defendants, it was pointed out, after quoting from the Escobedo and Miranda decisions, that at the time the incriminating statements were made (one being that the victim had voluntarily consented) "(t)he facts leave no room for doubt that the investigation here had begun to focus on Reyes (codefendant) at the time Lopez and the other officers came to take him to the police station. It is equally clear that Reyes had been taken into police custody, for the police were transporting him in a police car to the police station." The consequence was that the police were, within the prohibition of the cases, "carrying on a process of interrogation that lent itself to eliciting incriminating statements." For another illustration of "custodial interrogation" in a police vehicle see Myers v. State, 3 Md. App. 534, 240 A.2d 288.

■ Without again repeating the circumstances, when Officer Hatcher approached the automobile with an outstate license parked near a closed shopping center at 3 o'clock in the morning he was not so much as investigating any specific crime and there had been no arrest. He was simply, as he said, "questioning and trying to determine what they were doing there." It is not necessary to dwell upon the circumstances and illustrate at length, the evidence all but speaks for itself. Neither is it necessary to note the nice discriminations permitted by the Miranda, Escobedo and other decisions, they are well-noted in a recent New York case, People v. P., 21 N.Y.2d 1, 233 N.E.2d 255. There a police officer talked to the appellant outside his home. The court made this observation: "This kind of questioning is little different from routine police investigation of crimes or suspicious conduct at a person's home, his place of business or on the street—the kind of questioning which has uniformly been held not to require the Miranda warnings." In People v. Hazel, 252 Cal.App.2d 412, 60 Cal.Rptr. 437, the court quoted Miranda's "general on-the-scene" questioning rule and concluded: "In the instant case the record discloses

that at the time Ferraggiaro questioned defendant concerning his name and where he had obtained the guitar which he was attempting to sell at the pawnshop, defendant was not in custody nor deprived of his freedom of action in any significant way so as to bring the Miranda rule (of exclusion) into play. * * * It was not until the interrogation was completed that defendant was physically restrained."

The two cases nearest in point on their facts are Schnepp v. State (Nevada), 437 P.2d 84, and Allen v. United States, D.C. Cir., 390 F.2d 476. In the Schnepp case the police stopped an Oregon automobile and seeing a television set, partially covered, on the front seat (having been informed of such a theft) inquired as to its ownership and defendant said, "I don't know who it belongs to." The Nevada court said, "We conclude that although the answers 'I don't know' were in response to police propounded questions, neither the questions nor the answers were 'custodial interrogation' and thus totally without the purview of the Miranda doctrine. * * * The questions directed to Schnepp by the officer were proper, pre-custody inquiries, investigative and non-coercive in nature, and justified by the circumstances as a legitimate police practice." In the Allen case an officer at 3:30 a.m., saw a station wagon being driven at an extremely low speed with its headlights off and when the vehicle drove into an alley, the officer signaled with his flashing beacon and the car stopped. The officer intended to issue a citation for night driving without headlights but when he approached the vehicle and asked the driver for his license he noticed a man slumped over in the rear seat "whose 'face was beyond recognition,' bleeding profusely about the head." When asked who owned the automobile the driver, the appellant, said that he did not know. The drunk and beaten man in the rear seat was unable to respond intelligently but the officer noted that the defendant's "right hand knuckles were skinned." When asked whether he had beaten the man the appellant said he had. The appellant was convicted of two offenses—unauthorized use of a motor vehicle and simple assault. The court made several rather profound observations with respect to the Miranda opinion but pertinent here the court said: "Whether police have left the channel of 'investigation' and run onto the shoals of 'custodial interrogation' cannot be determined by reference to some chart clearly designating the various lights, bells, buoys and other channel markers. Nor is it possible or desirable to simplify the matter by saying that whenever any officer is prepared to detain an individual he may not ask any questions. Such a rule would venerate form over the substance of sound relations between police and citizens in a large community. We think *the relative routineness of an inquiry is a material indicator that the police are still in a state of investigation.*" (Emphasis supplied.) The court concluded: "We think that when the officer asked appellant if he had beaten Jeffries, he had not yet made a determination to arrest for assault but was rather engaged in sorting out the facts in a type of street investigation. Miranda did not require the officer to preface with the several warnings therein outlined the questions put to this appellant."

And so it was here as between Officer Hatcher and the appellant Bradford and for the indicated reasons the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.