

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-3-1997

# United States v. Murray

Precedential or Non-Precedential:

Docket 96-7072

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"United States v. Murray" (1997). *1997 Decisions.* Paper 3.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/3

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 96-7072
_____

UNITED STATES OF AMERICA

v.

MICHAEL MURRAY,
Appellant
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Criminal No. 92-00200-04)
_____

Argued:  August 12, 1996
Before: GREENBERG and ALITO, Circuit Judges,
and FISHER, Senior District Judge *

(Opinion Filed: January 3, 1997)
_____

OPINION OF THE COURT
_____

DAVID A. RUHNKE (Argued)
RUHNKE & BARRETT
47 Park Street
Montclair, NJ 07042

Attorney for Appellant

DAVID M. BARASCH
UNITED STATES ATTORNEY

WILLIAM A. BEHE (Argued)
Assistant U.S. Attorney
Federal Building
228 Walnut Street
Harrisburg, PA 17108

Attorneys for Appellee

_____
*  The Honorable Clarkson S. Fisher, Senior United States
District Judge for the District of New Jersey, sitting by
designation.

ALITO, <u>Circuit Judge</u>:

Appellant Michael Murray was convicted following a jury trial of an intentional killing in furtherance of a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848(e)(1)(A); conspiracy to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1); and distribution of and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). In this appeal, Murray argues that the district court erred in (1) admitting testimony under Fed. R. Evid. 404(b) and 403 that he had committed a murder not charged in the indictment; (2) admitting under Fed. R. Evid. 608 evidence supporting the credibility of the only testifying eyewitness to the events immediately preceding the charged murder; (3) denying Murray's motion to excuse for cause a juror who had read a newspaper article about the case; and (4) denying Murray's motion to suppress the testimony of a jailhouse informant. We hold that the district court erred under Fed. R. Evid. 404(b) and 403 in admitting testimony about the uncharged murder and in admitting evidence about specific instances of conduct supporting the credibility of the eyewitness, in contravention of Fed. R. Evid. 608(b). We conclude that these errors require reversal of Murray's murder conviction but that they are harmless with respect to his convictions on the other charges.

I.

Murray was indicted and arrested in August 1992. (App. 13) The superseding indictment on which he was tried alleged that Murray (whose "street name" was "Solo") and co-defendants Jonathan Ray Bradley ("Fresh" or "Johnny Fresh") and Emanuel Harrison ("Paradise") intentionally killed Juan Carlos Bacallo on January 28, 1992, while engaging in and working in furtherance of a drug distribution CCE. (App. 64) Bradley was alleged to be the leader of the drug ring, which imported cocaine from New York City in cookie boxes for sale in the 1400-1600 block of Market Street in Harrisburg. (App. 65-66)

In August 1993, the government filed notice that it would seek the death penalty against Murray. (App. 73-75) See United States v. Bradley, 880 F. Supp. 271 (M.D. Pa. 1994) (addressing death penalty issues). In June 1994, on the last day scheduled for jury selection, the parties informed the court that they had reached a plea agreement, and two days later, Murray, Bradley, and Harrison entered guilty pleas. (App. 88, 107-11) Murray's plea agreement was designed to result in an offense level of 40 (a base offense level of 43 with a three-level reduction for acceptance of responsibility), which would have produced a sentence in the neighborhood of 25 years' imprisonment, and the agreement provided that he could withdraw the plea if for any reason his offense level was ultimately calculated to be higher than 40. (App. 108). Because the

3

district court judge did not believe that Murray was entitled to a reduction for acceptance of responsibility due to his failure to show remorse, she held that Murray's offense level would be 43, which would have required a life sentence. (App. 50) Murray then moved to withdraw his plea, and the court granted the motion. (App. 52) Murray sought reconsideration of the death penalty authorization, and a few days before jury selection was scheduled to begin, the government advised that the Attorney General had withdrawn that authorization. (App. 337). Before this time, the government had been planning to use testimony concerning the uncharged murder during the sentencing phase as part of its argument in favor of the death penalty, but after the death penalty authorization was withdrawn, the government decided to attempt to introduce this testimony during the guilt phase of Murray's trial. See Govt. Br. at 33 n.2. (App. 78, 85).

Murray's trial lasted four days. The government offered strong evidence concerning his drug distribution activities, and we will not recount that evidence here. However, because of its relationship to Murray's two key evidentiary arguments, we will summarize the evidence relating to the murder. The government presented evidence that Bacallo, the murder victim, had been working for Bradley's drug ring as a street-level dealer and that he owed Bradley money for drugs he had been "fronted." (App. 786). Marguerite King, Bacallo's girlfriend, testified that a week before he was murdered Bacallo approached

4

Bradley to inform him that he was quitting the drug business and that Bradley responded by pointing a sawed-off shotgun at Bacallo's head and telling him that "once you are in this business, you never get out." (App. 787, 791) King admitted that she had lied to the police when she was questioned shortly after the murder, explaining that she had been afraid to tell the truth because Harrison was with her. (App. 788-89)

Jay Williams testified that on the night of the murder, Bacallo, Harrison, and he went to a bar even though Bacallo did not want to go. (App. 803-04) Williams said that he and Harrison asked Bacallo if the reason he did not want to go the bar was because "you don't got Fresh's money," but Bacallo denied this. (App. 803-04) Williams testified that inside the bar Bradley and Murray "smack[ed]" Bacallo repeatedly and that Bacallo, Bradley, Murray, and Harrison left the bar and got into a taxicab because, as Bacallo said, "[t]hey want me to do something for them." (App. 805-06) Williams admitted that at the time he testified he was incarcerated for drug trafficking, that he had lied shortly after the murder when he gave the police a statement (in which he denied any knowledge of the anything relating to the murder), and that he had been smoking marijuana and drinking alcohol on the night of the murder. (App. 799, 807, 811-12)

Richard Brown, a taxicab driver who was "friends" with Murray, testified that he picked up Bacallo, Murray, and Harrison (but not Bradley) in his cab on January 28, 1992, and that, at

5

Murray's direction, he drove them to a deserted part of State Farm Road in Susquehanna Township. (App. 717-19) He gave the following account of what happened next. Murray told Brown to pull over and instructed Bacallo to get out of the car because "he was going to make him walk." (App. 719) Harrison, whom Brown had noticed was carrying a sawed-off shotgun beneath his coat, remained in the car. (App. 719) Shortly after Murray and Bacallo walked away from the car, Brown heard gunshots. (App. 720) A few seconds later, Murray got back into the car, carrying a .45 caliber pistol, and said something to the effect of "that is what someone gets for being in violation." (App. 720) "[S]cared as hell," Brown drove Murray and Harrison back into town and then returned home. (App. 721-22) When he got home, Brown told Stephanie Stewart, with whom he was living at the time, what had happened. (App. 722)

Brown admitted that he had been working as an informant for the Harrisburg Police Department at the time of the murder, but that he had not reported what he had seen in the early morning of January 28, 1992, until July or August of that year. (App. 723) Brown explained that he waited so long "[b]ecause quite frankly, I was afraid, not only for myself, but for the people I cared about the [sic]. My mother was dying of cancer. I didn't want any accidents to happen to any of them. I cared about my children." (App. 723) Brown admitted that he had been using marijuana and cocaine for 27 years and that he had been

6

convicted of cocaine possession and theft of services.  (App. 725)

Stewart testified that when Brown returned home the day of the murder he told her that "I just saw Solo kill someone." (App. 767-68) She stated that when she read about the murder in the newspaper she asked Brown, "Is this what you were talking about?" and that he replied in the affirmative.  (App. 776)

After Murray cross-examined Brown, the government called Lt. John Goshert, a Harrisburg police officer, to testify in support of Brown's reliability.  Murray objected to Goshert's testimony on the ground that "the character of [Brown] for truthfulness" had not been "attacked by opinion or reputation evidence or otherwise," Fed. R. Evid. 608(a), and that even if it had, Lt. Goshert's testimony violated Fed. R. Evid. 608(b)'s proscription on proof of specific instances of conduct by extrinsic evidence.  (App. 822, 826-29) The court overruled Murray's objection.  (App. 829)

Lt. Goshert testified that, as the officer in charge of the Harrisburg police drug enforcement unit, he had utilized Brown as a confidential informant since 1988.  (App. 834-36) Lt. Goshert stated that in his opinion Brown was "extremely reliable" in providing accurate information.  (App. 836) Lt. Goshert explained that the Harrisburg police had "made" "[i]n excess of 65" cases and had obtained "numerous" search warrants as a result of Brown's services as an informant.  (App. 836)

7

Robert McCallister, a Susquehanna police officer, testified that he discovered Bacallo's body on the morning of January 28, 1992, and found seven shell casings nearby. (App. 648, 651-52) James Rottmund, a ballistics expert, testified that all seven casings were from the same .45 caliber gun and that the shots were fired from a distance of at least five feet. (App. 683-84) Dr. Isadore Mihalakis, a medical examiner, testified that Bacallo had suffered eight gunshot wounds: one to the right thigh, three to the right buttock, two to one hand, one to the other wrist, and one to the head. (App. 702-05, 707) Dr. Mihalakis testified that all eight wounds (which, he said, might have been caused by seven shots) were inflicted from behind, that the shot to the head was the final one, and that it occurred with Bacallo in a prone position. (App. 705, 710) He concluded that the manner of death was homicide. (App. 713)

Randy Drawbaugh and Sean Proffit, both jailhouse informants, testified as well. Drawbaugh testified that Murray had told him that "he shot a guy named Carlos" because "Carlos" owed him money. (App. 851-52) Proffit testified that Murray told him that he was going to "get" all of the witnesses against him when he was released from jail and, in particular, that "there was a certain witness named Juice [Xenophon Singleton] that he was going to get and throw his baby off the roof of a building."

8

(App. 870) Drawbaugh and Proffit were impeached with their criminal records.[1]

Murray's Rule 404(b) and 403 arguments are based on the testimony of Jemeke Stukes ("Quest"). Stukes testified that, while in New York City, he met Bradley, who introduced him to Murray. In August 1991, Stukes said, he went to Harrisburg to sell cocaine at Bradley's invitation. (App. 463-64) Stukes was indicted and arrested at the same time as Murray and pled guilty in January 1993 to conspiracy to distribute cocaine, for which he was sentenced to 24 months' imprisonment. (App. 19, 449) At the time of Murray's trial, Stukes had recently completed a combined 38 months of imprisonment on the federal conviction and related state charges. (App. 446-50) Stukes testified that Murray committed an uncharged murder in New York City in 1991. According to Stukes, in the middle of August 1991, "[a] guy by the name of Howie came by Mr. Bradley's store in Manhattan and said his little cousin was having problems with this guy," referring to a dispute over drug territory. (App. 457) Bradley told Howie that "me and Solo will take care of it," and he asked Stukes to "go along." (App. 457) Stukes explained that "Fresh [Bradley] had me go along to see how his reputation is established because, you know, he has a rep in New York as being

---

[1]1. Prior to trial, Murray had moved to exclude Proffit's testimony on the ground that Proffit's conversation with him violated Massiah v. United States, 377 U.S. 201 (1964), but after a pretrial hearing, the court denied the motion. (App. 412)

9

a shooter, and, you know, a fairly large drug dealer."  (App. 458) On a Sunday afternoon, "Howie" drove Bradley, Murray, and Stukes in a van to a housing project at 169th Street and Washington Avenue in the Bronx to look for a "heavy-set" Panamanian man. (App. 459) Stukes testified that Bradley and Murray wrapped their faces in towels so that only their eyes were visible and that all three of them left the van while Howie remained in it.  (App. 459) Then, according to Stukes, "Solo [Murray] went up to the guy" while "Fresh [Bradley] stood across the street."  (App. 459) Stukes testified that "Solo went up to the guy and pumped four slugs in his chest.  And as he was running back towards the van, Fresh, you know, had his gun out and he sprayed the building, you know, fired shots at the building because there was people standing out there."  (App. 460) Stukes fled the scene in a taxicab and did not report the incident to the police.  (App. 461, 463) Shortly thereafter, Stukes went to Harrisburg with Bradley and Murray.

A New York City Housing Police report shows that a man named Jorge Tesis was shot and killed on Sunday, July 21, 1991, at the location indicated by Stukes.  (App. 328) Two other individuals were also shot but were not seriously injured.  (App. 328) The report describes the alleged perpetrator as a 5'8" tall 20-year old; Murray was 18 or 19 years old at the time and is 6' tall.  (App. 328, 822) According to the report, a "witness states

10

male walked up to [the victim] and opened fire with a gun striking victim in the stomach and chest." (App. 329)

Murray was convicted on all counts. (App. 57) A sentence of life imprisonment was imposed, and Murray appealed.


II.

Murray challenges the admission of Stukes' testimony under both Fed. R. Evid. 404(b) and Fed. R. Evid. 403. We address his Rule 404(b) argument first.

A. As a general rule, "all relevant evidence is admissible," Fed. R. Evid. 402, and evidence is "relevant" if its existence simply has some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. However, Rule 404(b) restricts the admission of one category of relevant evidence.

Rule 404(b) provides in part as follows:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Thus, in order for "[e]vidence of other crimes, wrongs, or acts" to be admissible, it must be relevant to prove something other than "the character of the person in order to show that he acted in conformity therewith." In this case, therefore, Rule 404(b)

11

barred Stukes' testimony if it was relevant only to permit the jury to infer that Murray had a homicidal character and that this character found expression in the murder of Bacallo.  But if Stukes' testimony was relevant to prove anything else, Rule 404(b) did not preclude its admission.  On appeal, Rule 404(b) rulings "may be reversed only when they are clearly contrary to reason and not justified by the evidence." United States v. Balter, 91 F.3d 427, 437 (3d Cir. 1996)(quotation omitted). See also United States v. Himelwright, 42 F.3d 777, 781 (3d Cir. 1994).

The admission of evidence that is allowed by Rule 404(b) is not disfavored, but trial judges need to exercise particular care in admitting such evidence.  This is so for at least two reasons.  First, the line between what is permitted and what is prohibited under Rule 404(b) is sometimes quite subtle.  Second, Rule 404(b) evidence sometimes carries a substantial danger of unfair prejudice and thus raises serious questions under Fed. R. Evid. 403.  Therefore, it is advisable for a trial judge to insist that a party offering Rule 404(b) evidence place on the record a clear explanation of the chain of inferences leading from the evidence in question to a fact "that is of consequence to the determination of the action." Fed. R. Evid 401.  And it is likewise advisable for the trial court to place on the record a clear explanation of the basis for its ruling on the admission of the evidence.  Not only do these procedures help

12

to ensure that sensitive Rule 404(b) rulings are made with care (and thus to diminish the likelihood that these rulings will result in reversals), but these procedures greatly assist the process of appellate review.  Consequently, although the language of Rule 404(b) does not require such procedures, our cases have emphasized their usefulness.  See Himelwright, 42 F.3d at 782; United States v. Sampson, 980 F.2d 883, 888 (3d Cir. 1992).

Unfortunately, these procedures were not followed here.  The government never provided a clear explanation on the record of the chain of inferences on which it was relying.[2]  Its best explanation appears to have occurred at the charge conference,

2.  The government contends that Murray never objected under Rule 404(b) or Rule 403 to the introduction of Stukes' testimony. However, it appears to us that Murray did raise both of these issues.  The court opened the August 10, 1995 hearing by making its Rule 403 ruling (App. 377), which indicates that Murray had argued this point in chambers.  In addition, Murray repeated the objection on the record, if somewhat obliquely.  See App. 382 ("Your Honor, I would also point out that as the Court has noted, it is highly prejudicial.") Shortly thereafter, the government referred to the court's off-the-record discussion of the Rule 403 issue.  (App. 385) At an August 14 hearing, Murray's counsel noted that "[m]ost of my argument on the 404(b) material, the New York murders, was said in chambers off the record."  (App. 818) Later, when the court asked Murray's counsel to draft a limiting instruction for Stukes' testimony, he replied that "I am not quite sure what the relevance was, and it was my contention that it was not relevant."  (App. 820) While it is true that much of Murray's ire with respect to Stukes' testimony was directed at the fact that he did not receive notice that it would be used in the government's case-in-chief until the day before trial (because of the government's last-minute change in strategy precipitated by the withdrawal of the death penalty authorization), we are satisfied that Murray made it sufficiently clear that he was objecting to its relevance under Rule 404(b) and to its unfair prejudicial effect under Rule 403.  Fed. R. Evid. 103(a).  Cf. United States v. Long, 574 F.2d 761, 766 (3d Cir.), cert. denied, 439 U.S. 985 (1978).

13

when the prosecutor stated that Stukes' testimony "wasn't just [offered for] identity. Role in the organization, common scheme, plan, a number of different reasons." (App. 957) The prosecution provided no further explanation beyond these conclusory statements, and the district court similarly gave little explanation for its ruling admitting this highly sensitive evidence. The district court's most complete on-the-record explanation appears to have occurred during the charge to the jury when it said only that the evidence was admitted "for the very limited purpose to show identity, role in the conspiracy, a common scheme or plan," and cautioned that it was not admissible to prove character. (App. 995-96) We have searched the record but have been unable to find anything other than these conclusory assertions to support the admission of Stukes' testimony regarding the uncharged New York murder.

We have examined each of the grounds offered by the prosecution and accepted by the trial judge for the admission of this testimony, and even under the highly deferential standard of review that we generally apply to a trial judge's Rule 404(b) rulings, we believe that the admission of this evidence was improper. The government's principal Rule 404(b) argument seems to be that Stukes' testimony was relevant to show Murray's role in the conspiracy. While the government's brief does little to flesh out this argument, we perceive the argument to run as follows: Murray murdered the victim in New York City at the

14

behest of the CCE charged in the indictment; from this fact, the jury could infer that Murray was the CCE's designated "shooter"; and from this fact, the jury could infer that the shooting of Bacallo, which was committed in the interests of the Bradley CCE, was performed by Murray.

This theory, however, is undermined by the absence of any evidence that the New York murder about which Stukes testified was in any way related to the charged CCE. On the contrary, it appears from Stukes' testimony that the murder arose out of a dispute between the cousin of a friend of Bradley's ("Howie") and the New York victim over drug sales in New York City. The government has not directed our attention to any evidence that Howie, his cousin, or the New York victim were involved in the CCE described in the indictment or that the dispute with the New York victim had anything to do with the activities of that CCE, whose drug sales took place in Harrisburg. (App. 65-66) Thus, evidence that Murray was a triggerman in the New York murder does not tend to show that he performed the same role in the Harrisburg CCE, and consequently this evidence does not seem to be admissible under Rule 404(b) to show his role in the charged CCE.[3]

---

3. The government might conceivably have argued, not that the New York murder showed that Murray played the role of the CCE's designated killer, but that he played the role of Bradley's personal killer. But even if the government had made this argument, the legitimate probative value of this evidence would have been substantially outweighed by the danger of unfair prejudice for essentially the reasons set out in part IIB of this opinion.

15

The absence of evidence that the New York murder was related to the CCE charged in the indictment also dooms the government's argument that evidence of the New York murder was admissible because it and Bacallo's murder were committed on the basis of a common plan or scheme. As we explained in Government of the Virgin Islands v. Pinney, 967 F.2d 912, 916 (3d Cir. 1992), "[o]rdinarily, when courts speak of 'common plan or scheme,' they are referring to a situation in which the charged and the uncharged crimes are parts of a single series of events." In this case, there is no evidence that the two killings were planned together or that they involved a common design. Cf. United States v. Baker, 82 F.3d 273, 276 (8th Cir. 1996) (admitting evidence that the defendant police officer had previously employed a "remarkably similar" extortion scheme in which "a motorist is stopped for speeding, a firearm is discovered, and the motorist is given the choice of facing charges or 'working it out' with Baker").[4]

4. The same is true with respect to the government's suggestion on appeal that evidence of the New York murder was admissible to establish the existence of the charged CCE and Murray's membership in it. See Govt. Br. at 29. Since there was no evidence that the New York murder was committed as part of the charged CCE, Murray's commission of that murder does not tend to show either the existence of that enterprise or Murray's membership.

Another related argument advanced by the government on appeal is the contention that the New York murder showed Murray's motive for the Bacallo murder, "that is to advance the interests of the Continuing Criminal Enterprise." Govt. Br. at 35. Apparently, the government's theory is that the New York murder was relevant to show Murray's membership in the CCE and thus to show that he had a motive for the Bacallo killing, which furthered the CCE's

16

We also see no merit in the government's argument in the district court that proof of the New York murder was admissible to prove "identity" because that murder was "a signature killing" and because Bacallo's murder bore the same signature. (App. 820)  "The evidence concerning the manner in which the two alleged crimes were committed here was neither sufficiently detailed nor significantly unusual to permit any inference that the perpetrator of the second [crime] was the same perpetrator of the first."  Pinney, 967 F.2d at 916.  The New York murder was committed during the day on a public street at the spot where the victim was found.  The shooting occurred in the presence of bystanders, some of whom were apparently hit.  Two gunmen participated.  By contrast, the Harrisburg murder occurred at night in a secluded spot to which the victim was taken.  There were no innocent bystanders, and it appears that only one gun was used.[5]

(..continued)
interests.  But the lack of evidence linking the New York murder to the CCE is fatal to this theory.

5.  On appeal, the government advances the apparently new argument that evidence of the New York murder was admissible to refute in advance a claim that Murray had made in a letter to the district court after the sentencing hearing that followed his abortive guilty plea.  At that time, Murray claimed that Bacallo had lunged at him prior to the shooting, and the government maintains that evidence of the New York murder was relevant to show that the Bacallo killing was not accidental and was not committed in self-defense.  Govt. Br. at 29-30.  The government further argues that it "did not have to wait for rebuttal to offer this evidence."  Id. at 30.  Murray, however, did not testify, and the government does not claim that the defense ever suggested to the jury that the Bacallo murder was accidental or that it occurred in self-defense.  Moreover, the government itself notes that the theory that the killing was accidental or

17

In sum, we do not believe that any of the grounds advanced by the prosecution and accepted by the district court at trial can justify the admission of the evidence of the New York murder under Rule 404(b).

B. Moreover, even if this evidence had some relevance to show something other than that Murray has a homicidal character, this relevance was so slight and the potential for unfair prejudice was so great that Fed. R. Evid. 403 demanded the exclusion of the evidence.

Rule 403 provides in pertinent part that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." We review a Rule 403 ruling for abuse of discretion unless the district court failed to explain its ruling and "its reasons for doing so are not otherwise apparent from the record." Himelwright, 42 F.3d at 781.

In this case, the district court's on-record explanation for its ruling was minimal. It appears that the district court conducted virtually all of its Rule 403 discussion off the record in chambers and that the sum total of its on-record treatment of the issue is the conclusory statement that

(..continued)
in self-defense "was in stark contrast to the . . . nature of Bacallo's wounds." Id. at 9. Thus, without any suggestion by the defense that the killing was accidental or occurred in self-defense, it is questionable whether the New York killing was relevant, and in any event its probative value to show absence of accident or self-defense was undoubtedly negligible.

18

"[t]he Court recognizes that it is prejudicial, but it is also highly probative." (App. 377) When the record does not contain an adequate explanation of a trial judge's Rule 403 ruling, a remand for clarification may be appropriate, but here we see no reason for a remand, because we see no basis on which the admission of the evidence in question could be sustained. Cf. United States v. Sriyuth, 98 F.3d 739, 744 n.8 (3d Cir. 1996) ("We take this occasion, once again, to remind the district courts of their obligation to perform this weighing process on the record. Although we are able to perform this balancing here, other cases may require remand to the court for such proceedings or even for a new trial.").

It should go without saying that evidence in a murder trial that the defendant committed another prior murder poses a high risk of unfair prejudice. Stukes' testimony concerning the uncharged New York murder informed the jury that Murray had shot at point-blank range a man with whom he had no personal conflict and whom he appears not to have even known. Evidence would have to possess significant probative value to avoid being substantially outweighed by the grave danger of unfair prejudice that this testimony carried.

In the previous section of this opinion, we reviewed all of the government's arguments as to how the evidence of the New York murder was relevant to prove something other than Murray's homicidal character, and we concluded that this evidence

19

was not even relevant to show any of the permissible things mentioned by the government or the district court at trial. But even if the evidence of the New York murder had some relevance under one or more of these theories, its legitimate probative value was unquestionably slight. We will now again discuss all of the government's theories, but we will add a few comments about the government's best theory, i.e., that the proof of the New York murder was relevant to show Murray's role in the CCE.

As we previously noted, the government's theory apparently is that the evidence of the New York murder was relevant to show that Murray played the role of the CCE's killer, that the Bacallo murder was committed to serve the CCE's interests, and that therefore it could be inferred that Murray committed that murder. Even if there were some slight evidence that the New York murder was connected with the CCE charged in the indictment, the probative value of the testimony regarding the New York murder to show that Murray committed the Bacallo murder would still be small. Under the government's theory, the probative value of the evidence of the New York murder depends on the uniqueness of Murray's role as the CCE's "shooter." The events surrounding the New York murder, however, as recounted by Stukes, do not show that Murray played the unique and distinctive role of the CCE's killer. On the contrary, Stukes testified that Bradley "has a rep in New York as being a shooter," explained that Bradley brought him along to see how Bradley

20

established that reputation, and testified that <u>Bradley</u> "sprayed the building" with gunfire. (App. 458, 460) Accordingly, the testimony regarding the New York murder suggested at most that Murray was <u>a shooter</u>, not the shooter. Unless there were significant evidence linking the New York murder to the CCE, Stukes' account of the New York murder would appear to have little legitimate probative value.[6] Accordingly, we hold that the district court abused its discretion in concluding that any legitimate probative value possessed by this evidence was not substantially outweighed by the danger of unfair prejudice.

We are unable to conclude that the district court's Rule 404(b) and Rule 403 errors were harmless in relation to the murder charge. In order to do so, we would have to be persuaded that it is "highly probable that the evidence . . . did not contribute to the jury's judgment of conviction." <u>Government of Virgin Islands v. Archibald</u>, 987 F.2d 180, 187 (3d Cir. 1993) (quoting <u>United States v. Schwartz</u>, 790 F.2d 1059, 1062 (3d Cir. 1986)). While the jury might have convicted Murray of the murder without relying on Stukes' testimony, we do not believe that the other evidence against him was so overwhelming as to render that conclusion "highly probable." There was only one eyewitness, and

6. On redirect examination, Stukes was asked, "What was Mr. Murray's role or function or reputation in your crew?" and Stukes responded that he was "[j]ust a shooter." (App. 522-23) The parties have not addressed the question whether this testimony, as opposed to Stukes' testimony concerning the New York murder, was properly admitted, and we therefore do not reach that question here.

21

the jury might well have discounted or discredited his testimony based on his delay in reporting what he knew and his extensive history of drug use.  Furthermore, as explained below, his credibility was improperly bolstered with testimony that was proscribed by Fed. R. Evid. 608.  Many of the government's other witnesses were similarly impeached on the basis of inconsistencies in their stories, their interest in cooperating with the prosecution, and their own drug use.  Moreover, in its closing argument, the government emphasized Stukes' testimony.

The prosecutor said:
[Stukes] was present in July of 1991 when this defendant gunned down an individual in New York, participated in a murder with Jonathan Ray Bradley of a drug dealer over drugs.  Doesn't that help establish that this defendant was part of this conspiracy whose role as Stukes said was the shooter, whose favorite weapon was a .45?

This is not the trial of that incident in New York.  This is not that trial.  That evidence is offered to establish the reliability of all of the other information establishing this defendant as the killer of Juan Carlos Bacallao [sic] in this case.  And if you credit that testimony of Stukes, doesn't that help establish that this defendant is in fact a killer, the shooter, the executioner of Juan Carlos Bacallao [sic]?

App. 915-16 (emphasis added).

We cannot disregard the possibility that the evidence of the New York murder "weigh[ed] too much with the jury and . . . so overpersuade[d] them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge."  United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992) (quoting Michelson v. United States, 335 U.S. 469,

22

476-76 (1948)).  We are thus constrained to reverse the judgment of conviction as to the murder charge contained in count two and to remand for a new trial on that charge to be conducted without evidence of the New York murder.  In contrast, we believe that the erroneous admission of Stukes' testimony was harmless with respect to the drug charges contained in counts three and six of the superseding indictment.  Murray's argument on appeal focuses exclusively on the murder conviction, and it is with respect to that charge that the jury could have been improperly influenced by Stukes' testimony; while evidence that Murray was a murderer might have contributed to his conviction for murder, such evidence is unlikely to have persuaded the jury that Murray was guilty of the drug charges.  Moreover, the government presented substantially stronger evidence in support of the drug charges than in support of the murder charge, including testimony by many individuals who participated in the CCE or who were associated with participants as well as by a Harrisburg police officer who had made an undercover purchase of cocaine from Murray.  We therefore conclude that it is "highly probable," Archibald, 987 F.2d at 187, that Stukes' testimony did not contribute to the jury's conviction of Murray on the drug charges.

III.

Murray argues that the admission of the testimony of Lt. John Goshert of the Harrisburg police department contravened

23

Fed. R. Evid. 608.  Murray timely and clearly objected to Lt.

Goshert's testimony.  (App. 826-28) In relevant part, Rule 608

provides:
(a) The credibility of a witness may be . . . supported by
     evidence in the form of opinion or reputation, but
     subject to these limitations . . . (2) evidence of
     truthful character is admissible only after the
     character of the witness for truthfulness has been
     attacked by opinion or reputation evidence or
     otherwise.

(b) Specific instances of the conduct of a witness, for the
     purpose of attacking or supporting the witness'
     credibility . . . may not be proved by extrinsic
     evidence.

Murray's first argument is that Brown's character for

truthfulness was not "attacked by opinion or reputation evidence

or otherwise."  We disagree.  It is true that Murray did not

present any opinion or reputation evidence to impeach Brown, but

Murray's counsel performed an extended and vigorous cross-

examination of Brown that exposed Brown's various illegal and

sordid activities.  Murray's counsel questioned Brown about his

long-standing and heavy drug use, his acquaintance with many

Harrisburg drug dealers, his apparent under-the-table tax-free

compensation for his work as an informant, his convictions for

drug possession and theft of services, his unlawful carrying of

an unlicensed firearm, his concealment of his drug use from his

friend and contact in the Harrisburg police department, and his

prior inconsistent statements to the grand jury.  (App. 730-61)

In view of this questioning, the opinion or reputation testimony

given by Lt. Goshert fell within the language of Rule 608(a)(2)

24

permitting the introduction of such evidence to support a witness' credibility when his character for truthfulness has been "otherwise" attacked. See, e.g., United States v. Dring, 930 F.2d 687, 692 (9th Cir. 1991), cert. denied, 506 U.S. 836 (1992); Fed. R. Evid. 608(a), Advisory Committee Notes ("evidence of misconduct, including conviction of crime," permits rehabilitation).

Murray's more persuasive argument is founded upon Rule 608(b)'s prohibition on proving specific instances of a witness' conduct by extrinsic evidence. Once Brown's character for truthfulness was attacked by Murray's counsel, the government was entitled to attempt to rehabilitate Brown by calling a witness to give opinion or reputation testimony as to Brown's character for truthfulness. But the government was not entitled to present "extrinsic evidence" of "specific instances" of Brown's conduct "for the purpose of . . . supporting [his] credibility." Fed. R. Evid. 608(b). Lt. Goshert's testimony was as follows:

Q. Lieutenant Goshert, do you know an individual by the name of Richard Brown?

A. Yes, I do.

Q. Have you ever used Mr. Brown as a confidential informant?

A. On numerous occasions, the Harrisburg Police has utilized him.

Q. As a result pf [sic] your using Richard Brown as a confidential informant, have you made any cases?

A. Yes, we have.

Q. Do you have an idea of approximately how many?

A. In excess of 65. 65, 66 something like that.

25

Q. And search warrants, have you obtained search warrants based on his information?

A. Yes, we have numerous times.

Q. How long a period of time have you been dealing with Mr. Brown?

A. Since 1988.

Q. Based on your dealings with Mr. Brown and the cases you said that he has made, can you give us your opinion as to his reputation for being a reliable individual?

A. He is extremely reliable.

Q. In terms of the accuracy of the information?

A. Yes.

App. 835-36.

This testimony, in our view, included "extrinsic evidence" of Brown's character for truthfulness. United States v. McNeill, 887 F.2d 448, 453 (3d Cir. 1989)("Extrinsic evidence is evidence offered through other witnesses rather than through cross-examination of the witness himself or herself."), cert. denied, 493 U.S. 1087 (1990). Murray argues that Lt. Goshert's quantification of the cases that Brown had "made" constituted evidence of "specific instances" of Brown's conduct and thus should have been excluded under Rule 608(b). The government contends that Lt. Goshert's testimony was proper as foundation for his opinion as to Brown's character for truthfulness. In support of the admission of Lt. Goshert's testimony in the district court, the government argued that "[t]here has got to be some basis for the jury to know how he can give that opinion as

26

to his reputation.  And by letting the jury know they have a close working relationship over a period of time and that they have been involved in all of these incidents, then there is a basis for him giving that opinion."  (App. 828) We agree that Lt. Goshert's testimony that the Harrisburg police had used Brown as a confidential informant on "numerous occasions" since 1988 was necessary to establish that he had a basis on which to offer his opinion as to Brown's character for truthfulness.  However, his testimony that Brown had "made" 65 or 66 cases was more specific than can be justified as necessary to establish a foundation.[7]

United States v. Taylor, 900 F.2d 779 (4th Cir. 1990) presented a situation extremely similar to the instant case.  In Taylor as in this case, the government's fortunes depended in large part on the credibility of an informant, and the government called a law enforcement officer to testify as to the informant's reliability.  The officer testified that the informant "had acted as a buyer for the government on 15 to 18 drug buys," that he "had given reliable information in a particular case which resulted in the seller's conviction," and that "several others either pleaded guilty or were convicted as a result of [the informant's] testimony."  Id. at 780-81.  The court held that it was error to admit evidence that the informant's testimony had

_____

7.[7]  The government prepared a chart detailing the particular instances where Brown had provided information to the Harrisburg police, but it conceded that the chart was not admissible under Rule 608(b).  (App. 827)

27

resulted in convictions in other cases.  <u>Id</u>. at 781.  Lt.

Goshert's testimony was substantially identical, and we conclude

that its admission contravened Rule 608(b).

We are buttressed in this conclusion by the emphasis

placed by the government on Lt. Goshert's testimony in its

closing argument.  The government first told the jury that "[i]t

was very important, wasn't it, to hear from him?" and then

argued:

And Lieutenant Goshert, you think he would let any of his men or
himself kick down some door with a search warrant on a
drug raid or make an arrest on information from
somebody that they didn't think was reliable?  Sixty-
seven cases, Richard Brown has proven to be a reliable
source of information for.  They stake their lives on
his testimony -- on his information.  Does that give
you some sense of how reliable he is?

App. 913-14.  This emphasis compounded the significance of the

error in allowing Lt. Goshert's specific-instance testimony and

prevents us from concluding that the error was harmless.[8]  On

retrial, the district court should limit the government to

---

8.  [8]In <u>United States v. Piva</u>, 870 F.2d 753, 760-61 & n.9 (1st
Cir. 1989), the court held that it was error to allow "a
professional government witness [to] vouch[] for the credibility
of an informant," but found that the district court rendered the
error harmless by instructing the jury that: "Members of the
jury, you have to make a determination whether you believe Mr.
Pacheco [the informant].  Whether Mr. Costa believes him or not
is not relevant to that, you have to make that determination,
based on your own observations of Mr. Pacheco and only that, and
your judgment as to whether he was telling the truth."  No such
curative instruction was given in this case.

28

eliciting from Lt. Goshert only such testimony as is necessary to establish a foundation for his opinion.[9]

IV.

Murray also argues that the district court erred in denying his motion to disqualify for cause a juror who had read a newspaper article about the case. Immediately before trial commenced on August 10, 1995, the court asked whether any jurors had seen an article that appeared in the <u>Harrisburg Patriot-News</u> on August 2, 1995, entitled "Feds won't seek death penalty for accused killer, 22." (App. 85) The article stated, inter alia, that Murray had previously pled guilty to the murder and had described it as "not a premeditation or contract killing. It was just a stupid unfortunate incident." (App. 85)

A juror named Mary Kling acknowledged that she had read the article and was subjected to voir dire by the court and by Murray's counsel. (App. 413-15) Kling stated that all she could remember from the article was that the government had decided not to seek the death penalty and had not given any explanation for that decision, that Murray was accused of murder, and that he was

---

9. Murray does not argue that the erroneous admission of Lt. Goshert's testimony somehow taints his convictions on the drug charges. The prejudicial effect of Lt. Goshert's testimony was to bolster the credibility of Richard Brown, who testified about the murder of which Murray was convicted. However, Brown did not testify in support of the drug charges. We therefore conclude that the district court's Rule 608(b) error does not require reversal of Murray's drug convictions.

from New York.  (App. 414) She denied that she had formed any opinion as to Murray's guilt or innocence and affirmed that she could decide the case on the basis of the evidence.  (App. 413-14) The court was satisfied that Kling could serve impartially and denied Murray's motion to excuse her for cause.  (App. 419)

"In determining whether a particular juror should be excused for cause, our main concern is whether the juror holds a particular belief or opinion that will prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  Kirk v. Raymark Indus., Inc., 61 F.3d 147, 153 (3d Cir. 1995) (quotations omitted), cert. denied, 116 S. Ct. 1015 (1996).  "Determining whether a prospective juror can render a fair verdict lies peculiarly within a trial judge's province."  United States v. Polan, 970 F.2d 1280, 1284 (3d Cir. 1992), cert. denied, 507 U.S. 953 (1993) (quotation omitted).  We review the district court's ruling only for an abuse of discretion; "the question of the partiality of an individual juror `is plainly one of historical fact:  did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed . . . .  [Therefore,] the trial court's resolution of such questions is entitled, even on direct appeal, to special deference.'"  United States v. Ferri, 778 F.2d 985, 994 (3d Cir. 1985), cert. denied,

30

476 U.S. 1172 (1986) (quoting Patton v. Yount, 104 S. Ct. 2885, 2891 (1984)).

Under this deferential standard of review, we are unable to conclude that the court erred in allowing Kling to serve as a juror.

V.

Murray's final argument is that the district court erred in allowing Sean Proffit to testify as to what Murray told him in jail. Murray argues that the admission of Proffit's testimony deprived him of his Sixth Amendment right to counsel under Massiah v. United States, 377 U.S. 201 (1964). Massiah held that the government may not, consistent with the Sixth Amendment, use as evidence statements made by the defendant "which [it] had deliberately elicited from him after he had been indicted and in the absence of his counsel." Id. at 206. See also United States v. Brink, 39 F.3d 419, 421–22 (3d Cir. 1994). Thus, if the government had deliberately placed Proffit in proximity with Murray with the intention of eliciting incriminating statements from Murray in the absence of his counsel, Murray's claim would be valid. See United States v. Henry, 447 U.S. 264, 274 (1980). In this case, however, the district court held an evidentiary hearing following Murray's objection to Proffit's testimony and concluded that there was no

evidence that the government did so.  (App. 396–412) We perceive no error in the district court's treatment of this issue.

## VI.

For the foregoing reasons, we reverse the judgment of conviction and sentence on the murder charge and remand for a new trial.  We affirm the judgment of conviction as to the drug charges and remand for resentencing, if appropriate, on those counts.

---