

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-24-2001

# USA v. Lopez

Precedential or Non-Precedential:

Docket 00-1812

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"USA v. Lopez" (2001). *2001 Decisions.* Paper 246.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/246

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 24, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 00-1812, 00-1848, 00-1888, 00-1938 AND 00-1992

UNITED STATES OF AMERICA

v.

LOUIS LOPEZ, JR.,
        Appellant No. 00-1812

UNITED STATES OF AMERICA

v.

HERNAN NAVARRO,
        Appellant Nos. 00-1848 and 00-1992

UNITED STATES OF AMERICA

v.

JUAN CRISPIN,
        Appellant No. 00-1888

UNITED STATES OF AMERICA

v.

DELROY JOSIAH,
        Appellant No. 00-1938

On Appeal from the District Court of the Virgin Islands
(D.C. Criminal No. 99-cr-00016-1,2,3,4)
District Judge: Honorable Raymond L. Finch, Chief Judge

Argued May 14, 2001

Before: McKEE, RENDELL and BARRY, Circuit Judges ,

(Filed: October 24, 2001)

Warren B. Cole, Esq. [ARGUED]
Hunter, Colianni, Cole & Bennett
1138 King Street, Suite 301
Christiansted, St. Croix
USVI 00820
 Counsel for Appellant
Louis Lopez, Jr.

Patricia Schrader-Cooke, Esq.
 [ARGUED]
Office of Federal Public Defender
P.O. Box 3450
Christiansted, Saint Croix
USVI 00822
 Counsel for Appellant
Hernan Navarro

Jean-Robert Alfred, Esq. [ARGUED]
27 & 28 King Cross Street
Christiansted, St. Croix
USVI 00820
 Counsel for Appellant
Juan Crispin

Wilfredo A. Geigel, Esq. [ARGUED]
Law Offices of Wilfredo A. Geigel
P.O. Box 25749, Gallows Bay
Christiansted, St. Croix
USVI 00824
 Counsel for Appellant
Delroy Josiah

          Bruce Z. Marshack, Esq. [ARGUED]
          Office of United States Attorney
          1108 King Street, Suite 201
          Christiansted, St. Croix
          USVI 00820
           Counsel for Appellee
          United States of America

OPINION OF THE COURT

RENDELL, Circuit Judge.

Beginning in the late hours of September 22, 1998, and ending early the following morning, four men invaded three homes in St. Croix, Virgin Islands. By the time the four had completed their crime spree, Orlando Orta was dead and Concepcion Garcia Orta, James Sorhaindo, Reynoldson Ferrol, Jacklyn Tredway, and Thomas Barrows had all been assaulted. After an investigation, the police arrested four men: Juan Crispin, Delroy Josiah, Louis Lopez, Jr., and Hernan Navarro. Their trial and conviction form the basis for this appeal.

Crispin, Josiah, Lopez, and Navarro ("the defendants") raise a variety of issues. The most significant of these affects all four defendants and presents an issue of first impression: does Pinkerton liability[1] apply in the Virgin Islands? The defendants also challenge various evidentiary rulings and the sufficiency of the evidence of carjacking and gun possession. In addition, the defendants argue that the District Court erred by not conducting voir dire of a juror to determine bias, and by not granting a hearing in response to a charge of prosecutorial misconduct. [2] On the

---

1. As will be discussed in more detail later in the opinion, "Pinkerton liability" is a theory of vicarious criminal liability set forth in Pinkerton v.
United States, 328 U.S. 640 (1946).

2. Defendants make two additional challenges, which we believe merit very little discussion. First, they argue that the District Court had no jurisdiction because the crimes charged were not "of the same or similar character or part of, or based on, the same act or transaction or two or

issue involving Pinkerton liability, we find that the doctrine does exist in the Virgin Islands. With respect to this issue, and all other issues raised, we will affirm the rulings of the District Court.

I. FACTS

The trial involved defendants' conduct at three different residential locations in St. Croix:

A. 338 Estate Mount Pleasant

On the evening of September 22, 1998, a group of men invaded 338 Estate Mount Pleasant, the home of James Sorhaindo. Sorhaindo's friend, Reynoldson Ferrol, was also in the house at the time. The two were beaten and robbed by three masked assailants. Sorhaindo saw the face of one assailant, and, at trial, he testified that he thought that Navarro was his attacker. Sorhaindo also identified two watches and a chain that the police found outside the window of the third crime scene.

There were two eyewitnesses associated with this crime, Eugenio Guadalupe and Maha Joseph. Guadalupe testified that she saw Josiah, Crispin and Lopez from her residence, Building Five of the Paradise Project, which is in the vicinity of 338 Estate Mount Pleasant, around the time the crime occurred. Joseph testified that he lived in Building Four of the Paradise Project, and that he had been questioned regarding what he had seen around that same time. He stated that he had gone to the police station and

_____

more acts or transactions connected together or constituting part of a common scheme or plan," which is required by statute in order to give the District Court concurrent jurisdiction over the territorial crimes. 48 U.S.C. S 1612. Based on the ample evidence demonstrating the interconnected nature of the crimes, we find this claim to be without merit. Second, the defendants object to the use of identification evidence.
We note that the defendants do not challenge anything specific about the identifications in this case, but instead focus on the lack of reliability of
identifications in general. Thus, in order to find in their favor on this issue, we would have to find that eyewitness identifications are inherently unreliable and cannot be admissible in court. We decline to do so.

4

told them what he had seen. However, he denied having identified the defendants, instead expressing his"love" to the defendants in the courtroom and insisting that he had been forced to testify. A police officer, Lieutenant Secundino Roman Cruz, then took the stand to rebut Joseph's testimony, stating that Joseph had come to the police station on September 23, 1998, the day after the crime, and identified Crispin, Josiah and Lopez as having been in the vicinity of 338 Estate Mount Pleasant around the time of the crime.

B. 56 Estate Enfield Green

In the early morning hours on September 23, 1998, Jackie Tredway and Thomas Barrows were outside Tredway's residence, 56 Estate Enfield Green, when they were attacked, taken into the house, beaten with a gun, and kicked repeatedly. Their assailants told them that if they did not hand over their money, they would be killed. The intruders also insisted that Tredway give them the keys to her van.

After the attack, Tredway looked at photo spreads and picked out two men who she said bore a resemblance to one of her assailants. Neither of those pictures depicted any of the defendants. However, in court, she did identify one assailant, Crispin, whose face she had seen under a flashlight.3 She also testified that she had seen Crispin in a store and recognized him then as having been one of the intruders. She added that when she saw the picture of Crispin in the paper, she knew he was the man who had attacked her.

Tredway also identified items and photos of items that the police had recovered, including her car keys. Some of these items were found in her van, which had been abandoned next to one of the crime scenes, while others were recovered either at the site of the third crime scene or at Lopez' house.

_____

3. Tredway noted that because the incident occurred shortly after Hurricane Georges, her home was without power.

C. 66 Estate Enfield Green

The most serious crimes occurred at the last location, 66 Estate Enfield Green, the home of Concepcion Garcia Orta and her husband Orlando Orta. The couple was asleep in bed. The assailants entered the home and shot at the couple. Mrs. Orta's hand was mutilated by one gunshot; another killed her husband. The intruders stole cash, a chain and a watch.

At trial, Mrs. Orta identified the watch that had been stolen, which the police discovered during their search of Josiah's residence. The police recovered many items at the Orta home that were taken from the two previous crime scenes, including a camera and minicassette player that Tredway later identified as hers. The police also found a knife outside the Ortas' bedroom window, with a fingerprint matching Navarro's. Additionally, a shoe print was lifted matching Josiah's boot print, and a slug found in the door was determined to have come from Crispin's gun. The doctor who treated Mrs. Orta in the emergency room also testified regarding her injuries, and photos of her hand were introduced into evidence over a defense objection that they were prejudicial and should not be admitted based on Fed. R. Evid. 403.

D. Searches of Defendants' Homes

In a series of searches of the defendants' homes, the police uncovered a variety of incriminating items. In the home of Lopez, the police found a bag with Sorhaindo's name on it containing two VCRs, a striped bag with Tredway's van keys in it, ammunition similar to that found at the Orta home, slugs matching those found both at the Orta home and Josiah's residence,[4] and clothing matching the descriptions given by victims. In Josiah's residence, police discovered boots with a print matching that found at the Orta home, a watch later identified as Mr. Orta's, and slugs matching both those found at the Orta home and at Lopez' home.[5] And in the residence that Navarro shared

_____

4. At trial, Gregory Bennerson, a ballistics expert, testified that this type of slug was very unusual -- he had only seen that type of ammunition six to eight times during his sixteen year career.
5. Josiah had a running commentary with police during the search, and said, "You should have come yesterday, everything was here yesterday. The big one was here yesterday."

with other family members, the police found a camouflage jacket with a gun in the pocket and camouflage pants and a t-shirt, clothing that matched the victims' descriptions of the assailants' clothing.6

E. Crispin's Arrest

On October 20, 1998, police officers were responding to a complaint near Paradise Project when they spotted a Nissan driven by Crispin. Once the officers were in pursuit, the Nissan turned a corner and the police saw a person flee the vehicle. After unsuccessfully chasing the individual, they saw the car still had someone in it. The police discovered Crispin in the driver's seat, sitting with the seat reclined back in an apparent attempt to hide. Crispin did get out of the car after the police instructed him to do so, but he aroused further suspicion by throwing his keys inside the locked car as he was closing the door. The police officers then spotted what appeared to be marijuana on the front seat and called for back-up. Crispin told Sergeant Pemberton, one of the responding officers, that there was a gun under the seat. A forensics officer came to the scene and recovered a weapon and ammunition from under the driver's seat. At trial, ballistics expert Gregory Bennerson testified that a slug from the Orta home had been fired from this same gun, and also that the same gun had expelled a cartridge onto the porch under the window of that home.

II. PROCEDURAL HISTORY

On April 6, 1999, defendants Crispin, Josiah, Lopez and Navarro were charged in a twenty-two count indictment. At their consolidated trial, victims Ferrol, Sorhaindo, Tredway, Barrows and Orta were among those witnesses that testified on behalf of the government. Eyewitnesses Guadalupe and Joseph took the stand, as did Lieutenant Cruz, who testified regarding what Joseph had originally told the police. Another police officer, Jonathan Hitesman, testified regarding the collection of evidence at the Orta

_____

6. There is no information in the record regarding a search of Crispin's home.

7

home, where items from Tredway's home, a knife with Navarro's fingerprint, a slug from Crispin's gun, and a shoe print matching Josiah's boot were found. In addition, the government presented four expert witnesses: Sandra Wiersma, who identified the boot print found outside 66 Enfield Green as matching Josiah's; Gregory Bennerson, who testified as a ballistics expert and determined that slugs found at the Orta home came from Crispin's gun, and were the same types of unusual slugs found at Lopez' house; and Kenneth Getz and John Massey, who both stated that the fingerprint discovered at the Orta home matched Navarro's. The defendants did not take the stand, but did present witnesses on their behalf.

The defendants were found guilty by a jury of murder, burglary, robbery, possession of a firearm during the commission of crimes of violence, assault with the intent to commit murder and robbery, and mayhem with intent to commit a felony, all of which were charged under Virgin Islands statutes. Navarro was found guilty of threatening witnesses Sorhaindo and Ferrol, and Crispin alone was convicted of possession of a firearm pursuant to 14 V.I.C. S 2253(a). All defendants were found guilty of carjacking and of possessing a firearm in relation to the commission of carjacking, both of which are federal crimes.

The defendants were sentenced to life without parole on the murder charge and additional years on the other counts. They filed motions for new trials, which were denied. Timely Notices of Appeals were filed. These matters were consolidated on January 26, 2001.

III. DISCUSSION

The District Court had jurisdiction under 48 U.S.C. S 1612, commonly known as the Organic Act:

> [Along with jurisidiction over federal criminal offenses, the District Court of the Virgin Islands has] concurrent jurisdiction with the local courts of the Virgin Islands over those offenses against the criminal laws of the Virgin Islands which are of the same or similar character or part of, or based on, the same act or transaction or two or more acts or transactions

> connected together or constituting part of a common
> scheme or plan . . . .

Id. We have appellate jurisdiction under 28 U.S.C. S 1291.

A. Pinkerton Liability

In Pinkerton v. United States, 328 U.S. 640 (1946), the Supreme Court held that the criminal act of one conspirator in furtherance of the conspiracy is"attributable to the other[ ] [conspirators] for the purpose of holding them responsible for the substantive offense." Id. at 647. This aspect of Pinkerton, commonly referred to as the Pinkerton theory of liability or the Pinkerton doctrine, permits the government to prove the guilt of one defendant through the acts of another committed within the scope of and in furtherance of a conspiracy of which the defendant was a member, provided the acts are reasonably foreseeable as a necessary or natural consequence of the conspiracy. Id. at 647-48.

At trial, the government asked that the jury be given a Pinkerton instruction. The District Court granted the government's request, finding that Pinkerton's "reasoning applying to federal statutes could also apply to local statutes." The Court gave the following instruction to the jury:

> Counts I through XVII and Counts XX and XXI charge the defendants as principal, aiders and abettors and under a theory of criminal responsibility call[ed] Pinkerton Liability. In order to sustain its burden of proof for Pinkerton Liability, the Government must prove the three essential elements beyond a reasonable doubt:
>
> 1. That a conspiracy existed in that there was an agreement between individuals to align themselves with others in the criminal venture;
>
> 2. That having so aligned themselves together, one or more of the others of them acted to commit the substantive offense; and
>
> 3. That the substantive offense was committed in furtherance of the criminal venture in which the defendant had aligned himself with others.

It is not required that a conspiracy be charged in the indictment for Pinkerton liability to apply, as long as the evidence at trial establishes beyond a reasonable doubt that a conspiracy existed and that the substantive offense was committed in furtherance of the conspiracy. . . .

Defendants make two separate arguments that the jury should not have been instructed that Pinkerton liability could apply to territorial crimes. First, they argue that when conspiracy has not been charged, there can be no Pinkerton liability. Though this is our first opportunity to address this issue, we have little difficulty following our sister circuit courts of appeals in determining that a conspiracy need not be charged in order for Pinkerton's doctrine to apply. E.g., United States v. Chairez, 33 F.3d 823, 827 (7th Cir. 1994) ("[T]he absence of a conspiracy charge does not preclude the district court from applying a Pinkerton theory . . . if the evidence so suggests."); Thomas v. United States, 748 A.2d 931, 934 (D.C. Cir. 2000) ("[E]very federal court that has decided[whether Pinkerton can be charged when there is no conspiracy charge in the indictment] has held that such an instruction is proper.").

The more significant challenge leveled by defendants is their contention that the Pinkerton doctrine does not apply in trials involving Virgin Islands law. In examining the case law, Pinkerton liability has only been mentioned in cases in the Virgin Islands involving federal offenses. See, e.g., United States v. Koenig, 53 F. Supp. 2d 803, 808 (D.V.I. 1999). Here, the jury was given a Pinkerton instruction for all crimes, not just the federal offenses.

The defendants argue that the Virgin Islands aiding and abetting statute, 14 V.I.C. S 11,7 sets forth the only ways a

_____

7. The aiding and abetting statute, 14 V.I.C.S 11, provides:

(a) Whoever commits a crime or offense or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another person would be a crime or offense, is punishable as a principal.

Id.

10

defendant can be held criminally responsible for the acts of another.[8] The government, however, contends that "[n]othing in the Virgin Islands Code prohibits the application of Pinkerton to territorial crimes." Gov't Br. at 41. Our review of Virgin Islands case law reveals that Pinkerton has never been explicitly applied or rejected. We therefore are confronted with an issue of first impression.

Because we find that there is no case law governing this precise issue, we look to 1 V.I.C. S 4, which provides:

> The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.

Id. We are dealing with criminal law, so there is no Restatement to consult. We thus must consider whether Pinkerton is a "rule[ ] of the common law, . . . as generally understood and applied in the United States . . . ." Id. Without a doubt, Pinkerton is part of federal common law. E.g., United States v. Thirion, 813 F.2d 146, 151 (8th Cir. 1987) ("[C]oconspirator liability does not have its genesis in this statute, but rather in the common law. See Pinkerton, 328 U.S. at 647."). In addition, it is the rule in the majority of jurisdictions. See, e.g., State v. Walton, 630 A.2d 990, 997 (Conn. 1993) ("Pinkerton liability is now a recognized part of federal criminal conspiracy jurisprudence."). Further, we can find no local law to the contrary. The aiding and abetting statute makes punishable certain acts one commits as a principal but does not speak to, or rule out, co-conspirator punishment for an offense. Also, we do

_____

8. The defendants also rely on Gov't of the Virgin Islands v. Aquino, 378 F.2d 540 (3d Cir. 1967), to support their argument concerning Pinkerton liability. However, this case is inapposite. Aquino did not address co-conspirator liability at all, making no mention of the application of Pinkerton liability in the Virgin Islands. Rather, it merely clarified that
the effect of the Virgin Islands aiding and abetting statute, 14 V.I.C. S 11,
was to abolish common law distinctions between accessories before and after the fact and principals in the first and second degree. Id. at 552-53.

11

not view the fact that the specific criminal offenses at issue punish the commission of the offense, without including accomplice or other liability, as reflecting a local law to the contrary.

Hence, we conclude that the Pinkerton doctrine does apply in the Virgin Islands.9 Thus, we find that the District Court did not err in instructing the jury that they could convict the defendants under the Pinkerton doctrine.

B. Rule 403 Challenge to the Admissibility of
        Photographs

The defendants argue that the District Court erred in admitting photographs of Mrs. Orta's mutilated hand, instead of relying simply on her testimony and that of the doctor who treated her in the emergency room. They argue that the admission violated Fed. R. Evid. 40310 for two reasons. First, the defendants contend that insofar as there was other evidence of the injuries, the probative value was low. Second, they assert that given the photographs' graphic nature, the prejudicial value was high. The government responds that because the photographs related to the charge of mayhem, which requires a showing that Mrs. Orta was "seriously disfigure[d] . . . by . . . mutilation" or that a body part was destroyed or disabled, the evidence was highly probative and, moreover, not unfairly prejudicial.

We have previously held that "[a] district court has broad discretion to determine the admissibility of relevant evidence in response to an objection under Rule 403." United States v. Balter, 91 F.3d 427, 442 (3d Cir. 1996). We have also stated: "If judicial restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an

_____

9. Of course, if the legislature of the Virgin Islands does not believe that
Pinkerton should apply to crimes charged under Virgin Islands statutes, it can simply enact a "local rule to the contrary."

10. Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

12

appellate tribunal." United States v. Long , 574 F.2d 761, 767 (3d Cir. 1978). We review for abuse of discretion. United States v. Driggs, 823 F.2d 52, 54 (3d Cir. 1987).

We agree with the District Court that the photographs had value insofar as they were the best evidence of mutilation available, and we see nothing in the record to indicate that they were unfairly prejudicial. Therefore, we find that the District Court did not abuse its discretion. See In re Air Crash Disaster Near New Orleans, 767 F.2d 1151, 1154 (5th Cir. 1985) (finding no abuse of discretion in admitting photographs of bodies of plane crash victims with third degree burns where conscious pain and suffering at issue); United States v. Brady, 579 F.2d 1121, 1129 (9th Cir. 1978) (noting that photos from crime scene only inadmissible when picture of such "gruesome and horrifying nature" that danger of inflaming jury outweighed its probative value).

C. Rule 16 Challenge: Failure to Supply Written
        Summary of Expert Testimony

The government called FBI fingerprint specialist Kenneth Getz to offer expert testimony that the fingerprint found at the Orta home was Navarro's. The defense objected to his testimony at trial on the ground that it did not receive the required information in advance pursuant to Fed. R. Crim. Pro. 16(a)(1)(E), which states:

> At the defendant's request, the government shall disclose to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. . . . The summary provided under this subdivision shall describe the witnesses' opinions, the bases and the reasons for those opinions, and the witnesses' qualifications.

Id. The District Court agreed with the government's argument that the defense's failure to raise the issue earlier and "trigger the resources of the court . . .[did] not sit well with [it]," and, because the defense did not fulfill its "obligation to ask for a Daubert hearing," it would admit the testimony.

13

Navarro asserts that by only producing in advance of trial a two-page Report of Examination regarding the expert's examination of the fingerprint found on the knife, without information regarding "the bases and the reasons" for the expert's opinion, and by not proffering the expert's qualifications until trial, the government violated Rule 16(1)(a)(E).

The government does not dispute that inadvertently it did not provide its expert witness's qualifications until trial. However, the government notes that the witness's resume was immediately produced when the government became aware, via a defense motion to exclude expert testimony, that it had not been provided.

With respect to Navarro's contention that the government failed to list the bases and the reasons for the expert's opinion, it argues that due to the content of the expert testimony, that is, the determination of "whether the fingerprints found on a knife at the murder scene matched or didn't match [Navarro's] known prints," Gov't Br. at 70, the information provided was sufficient. The government contends that, in any event, the defense did not raise this issue of discovery noncompliance until trial in a strategic effort to exclude the testimony rather than allow the government time to produce the missing information. And more important, the government maintains that Navarro cannot demonstrate any prejudice that resulted.

We will assume, without deciding, that by not providing the expert witness's resume to the defense until trial, and only providing the defense with a brief summary of the expert report, the government violated the requirements of Rule 16(a). Accordingly, we must look to Rule 16(d)(2), which addresses the situation in which a party fails to comply with a discovery request. It states only that, upon the court becoming aware of the failure, it "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Id. In other words, on its face, the Rule does not require a district court to do anything -- Rule 16 merely states that the court"may" take such actions.

14

In determining whether we should second guess the District Court's view of what was "just," we will consider any harm caused by the government's violation. In United States v. Miller, 199 F.3d 416 (7th Cir. 1999), the Court of Appeals for the Seventh Circuit held that, where the government failed to properly disclose expert witness testimony, a new trial was not warranted unless "the remedy offered by the district court was inadequate to provide [the defendant] with a fair trial." Id. at 420. In addition, the Court of Appeals for the Ninth Circuit held that the government's failure to comply with Rule 16 only compelled reversal where the appellant "demonstrate[d] prejudice to substantial rights [where] [t]he prejudice that must be shown to justify reversal for a discovery violation is a likelihood that the verdict would have been different had the government complied with the discovery rules, not had the evidence [been] suppressed." United States v. Mendoza, 244 F.3d 1037, 1047 (9th Cir. 2001). In accordance with these holdings, we require a showing that the District Court's actions resulted in prejudice to the defendant.

We need not specify the parameters of this inquiry because, here, Navarro makes no allegation of prejudice. He does not attempt to explain how the government's failure resulted in a denial of his right to a fair trial. Due to the absence of a showing of prejudice caused by the government's failure to comply with 16(a)(1)(E), and given the discretion explicitly provided to the District Court by Rule 16's language, we decline to grant the defendant the extreme remedy of a new trial.

D. Admission of Testimony Pursuant to Fed. R. Evid. 801(d)(1)(C)

Maha Joseph, a government witness, was subpoenaed to testify that he had told the police, on the day after the crime, that he had seen three of the defendants in the area of the crime during the time the homes were invaded. On the day he was called to testify, Joseph failed to appear in court. Once he was apprehended by the United States Marshal and brought to court to testify, he denied making any such statement to the police and was declared a hostile witness. The government then sought to impeach him

15

about the statement he had made to the police regarding the defendants.

After Joseph had testified, the government called Lieutenant Cruz to the stand and questioned him about Joseph's prior statement. The defense objected to the admission of his testimony on the grounds that it was hearsay. The District Court permitted Cruz to testify, finding that as long as the testimony was limited to the statement regarding the identification, it fell under Fed. R. Evid. 801(d)(1)(C). Cruz testified that Joseph had reported to the police that he had seen the defendants on the night of the crime in the vicinity of the crime scene. We review the admission of his testimony for abuse of discretion.[11] United States v. Brink, 39 F.3d 419, 425 (3d Cir. 1994).

Fed. R. Evid. 801(d)(1)(C) provides: "A statement is not hearsay if . . . the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . one of identification made after perceiving the person." The defendants argue that the Rule does not contemplate identifications of this nature but, rather, pertains to the selection of defendants from lineups or photo spreads. They also contend that testimony regarding when and where Joseph saw the defendants did not qualify as an identification. The

_____

11. Defendants also assert that the District Court erred by not conducting a hearing in response to their claim that the government committed prosecutorial misconduct by calling Maha Joseph to the stand knowing that he would give unfavorable testimony. They argue that the government intentionally put Joseph on the stand in order to make Detective Cruz' hearsay statements admissible through impeachment, which constituted misconduct because impeachment "may not be permitted where employed as a mere subterfuge to get before the jury evidence not otherwise admissible." United States v. Webster, 734 F.2d 1191, 1192 (7th Cir. 1984). The District Court concluded that because Joseph "had not previously testified in any manner inconsistent with his statement" and there was no "indication he had told the Government he intended to recant his prior statement," any conclusion by the government regarding how Joseph would testify would have been nothing but "a guess." We see no basis in the record to conclude that the prosecution engaged in misconduct, and thus will not disturb the District Court's ruling.

government responds that an identification without the when and where would be nonsensical. It also argues that the Rule was designed to encompass exactly this type of testimony (and not just lineup and photo spread identifications).

Statements of prior identifications are admitted as substantive evidence because of "the generally unsatisfactory and inconclusive nature of courtroom identifications as compared with those made at an earlier time under less suggestive conditions." Fed. R. Evid. 801, advisory committee notes. We noted in Brink, 39 F.3d at 426, that evidence is generally admitted under 801(d)(1)(C) "when a witness has identified the defendant in a lineup or photospread, but forgets, or changes, his testimony at trial." We explained that this Rule then permits a third person to testify regarding the previous statements of the eyewitness. Id.; see also United States v. Blackman, 66 F.3d 1572, 1578 (11th Cir. 1995) (holding that testimony of FBI Agent regarding bank teller's out of court identification was properly admitted under 801(d)(1)(C)); United States v. O'Malley, 796 F.2d 891, 899 (7th Cir. 1986) (stating that FBI Agent testimony regarding prior statements of witness who recanted at trial was admissible); United States v. Jarrad, 754 F.2d 1451, 1456 (9th Cir. 1985) (holding that Agent's testimony as to witness's identification was not hearsay).

Certainly the purpose of the Rule seems to be fulfilled here, where Joseph abandoned his previous knowledge of the defendants at trial. While we have yet to construe Rule 801(d)(1)(C) as covering this type of identification, that is, one that consists of a person coming forward after a crime is committed and saying he saw a particular person at a certain place and time, viewing both the Advisory Committee notes to Rule 801 and our own case law, we see no basis to conclude that Rule 801 does not extend to such situations. Any concerns regarding conditions or circumstances that might bear on reliability are matters going to the weight of the evidence, which can be addressed on cross-examination, and should not affect the admissibility of the statement. In any event, certainly the trial judge did not abuse his discretion, nor was the error

17

prejudicial in light of the overwhelming evidence against the defendants. See Fed. R. Evid. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); United States v. Adams, 252 F.3d 276, 281 (3d Cir. 2001) ("In practice, Rule 52(a) applies when the defendant has made a timely objection to an error, and the court of appeals normally engages in a so-called "harmless error" inquiry to determine whether the error was prejudicial to the defendant, with the government bearing the burden of persuasion on the issue of prejudice."). We cannot imagine that the defendants would not have been found guilty but for the detective's testimony regarding Joseph's identification. Even if the statement was arguably inadmissible, its admission was harmless.

E. Admission of Clothing Seized From Navarro's Home

Navarro challenges the admission into evidence of items seized from his home, including a camouflage t-shirt, jacket and pants, as well as a .380 pistol. He argues that the District Court should not have admitted the evidence because it was barred by Fed. R. Evid. 402 and 403. Navarro contends that under Rule 402, the items were not relevant because he shared the home, and the items were not necessarily his but could have belonged to others. Additionally, because he contends that the ownership of the items could not be ascertained with certainty, he argues that their admission subjected him to unfair prejudice.

This claim is without merit. Navarro's argument does not really implicate issues of relevancy under Fed. R. Evid. 402, or of prejudice under Fed. R. Evid. 403 but, rather, it goes only to the weight of the evidence. Defense counsel had the opportunity to address issues regarding the multiple occupants of the home on cross-examination and during his statements to the jury. In addition, the relevance and probative value of the evidence are obvious, given the testimony that the assailants wore similar clothing to the items found in Navarro's home, and the fact that the firearm was found in the pocket of the jacket.

We find no abuse of discretion here.

F. Sufficiency of Evidence of Carjacking

The jury found the defendants guilty of carjacking based on the theft of Tredway's van during the course of the

18

robbery and assaults. The carjacking statute requires proof of five elements: (1) taking a motor vehicle (2) that had been transported, shipped, or received in interstate or foreign commerce (3) from the person or presence of another (4) by force or intimidation (5) with the intent to cause death or serious harm. 18 U.S.C.A. S 2119.

When evaluating a challenge to the sufficiency of the evidence, we examine whether the jury could have rationally found that each of the challenged elements had been established beyond a reasonable doubt. United States v. Lake, 150 F.3d 269, 272 (3d Cir. 1998). We review the evidence in the light most favorable to the government. United States v. Xavier, 2 F.3d 1281, 1288 (3d Cir. 1993); see also United States v. Casper, 956 F.2d 416, 421 (3d Cir. 1992) ("Appellate reversal on the grounds of insufficient evidence should be confined to cases where the failure of the prosecution is clear.").

The first element is not in dispute. Tredway's van was stolen. The defendants also do not dispute the second element. However, defendants challenge the proof of the third element because Tredway was inside her residence and the van was outside. They urge us to depart from our ruling in Lake, 150 F.3d 269, which leaves little room for argument regarding this issue. In Lake, a man was on a beach and had his van parked at a hilltop where it was not visible. Id. at 270. His keys were forcibly taken from him by the defendant on the beach. Id. at 271. On appeal, the defendant argued that the evidence did not show he took the car "from the person or presence of another." Id. at 272. We were unpersuaded by his argument, and found that this element meant that the car was "so within his reach, observation or control, that he could if not overcome by violence or prevented by fear, retain his possession of it." Id. at 272. The circumstances in Lake are sufficiently similar to those here so that Lake controls. Therefore, the third element is satisfied.

The fourth element is not in dispute, and is clearly controlled by United States v. Applewhaite, 195 F.3d 679, 685 (3d Cir. 1999), where we held that the threatened or actual force at issue must be employed in furtherance of the taking of the car. The evidence here clearly establishes

19

that it was. The fifth and final element is easily satisfied by the circumstances under which the car was stolen-- the defendants insisted Tredway give them her keys in the course of a robbery and assault. See Holloway v. United States, 526 U.S. 1, 8 (1999) (holding that intent to carjack requires that defendant possessed intent to seriously harm or kill driver if necessary to steal car.)

We agree with the government. The record clearly supports the carjacking convictions. We will, therefore, reject the defendants' challenge to the sufficiency of the evidence as to this offense.

G. Sufficiency of Evidence of Gun Possession

Crispin argues that the evidence was insufficient to support his conviction for gun possession. As we recounted above, Crispin was discovered by the police crouched down in the car he had been driving, and when he was ordered out, he threw the keys inside the car, then locked the door. He then told an officer who had arrived that there was a gun under the seat. Forensic testing linked that gun to the crimes at issue in the instant case.

Crispin argues that the government failed to prove that he possessed the gun as required by 14 V.I.C. S 2253(a):

> Whoever, unless otherwise authorized by law, has, possesses, bears, transports or carries either, actually or constructively, openly or concealed any firearm, . . . [and any] such person [who was previously] convicted of a felony in any state, territory, or federal court of the United States, or if such firearm or an imitation thereof was had, possessed, borne, transported or carried by or under the proximate control of such person during the commission or attempted commission of a crime of violence, as defined in subsection (d) hereof, then such person shall be sentenced to imprisonment . . . .

We must determine whether the jury could have rationally found that the elements had been established beyond a reasonable doubt. Lake, 150 F.3d at 272. We review the evidence in the light most favorable to the government. Xavier, 2 F.3d at 1288.

20

We note that, here, the operative language of the Virgin Islands statute encompasses not only "possession," but covers anyone who "bears, transports or carries .. . actually or constructively." 14 V.I.C. S 2253(a). Prior to November 1996, section 2253(a) made it unlawful for a person to have a firearm "under his control in any vehicle." 14 V.I.C. S 2253 (1996). This phrase was deleted, however, and now, where a defendant "had, possessed, bore or carried" a firearm in his automobile, the statute no longer requires that it be "under his control." No court has yet construed the implication of this alteration.

While the language has changed, we have defined the concept of "constructive possession" so as to make the issue of control still a central theme. We have stated that constructive possession exists if an individual"knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons." United States v. Blackston, 940 F.2d 877, 883 (3d Cir. 1991) (quoting Black's Law Dictionary 1047 (5th ed. 1979)). Here there is no question that Crispin had knowledge of the gun since he actually told the police officer that the gun was in the car. But, could the jury have found that he had the "power and intention" to "exercise control over" the gun?

We think the facts present here could easily justify the inference the jury may have drawn in favor of Crispin's constructive possession of the gun; these include, his operation of the vehicle, his admitted knowledge of the firearm's presence in the car, and its location underneath the car's front seat and therefore within his reach. In United States v. Iafelice, we found constructive possession of drugs in the car's trunk, placing considerable weight on the defendant's ownership and operation of the car, but also stressing the need for these facts to be "considered in the context of the surrounding circumstances." 978 F.2d 92, 97 (3d Cir. 1992).

We previously upheld the finding of constructive possession under the former version of 2253(a), where we determined the firearm was under the control of the defendants. In McKie, the driver and two passengers of the car were found to have the firearms under their control, so

21

as to possess them where the guns were all in plain view inside the compact car. United States v. McKie , 112 F.3d 626 (3d Cir. 1997). In Xavier, the driver was found to have possession of a gun held by a passenger exiting the car, because it was within his "grab area" when it was in the passenger cabin. Xavier, 2 F.3d at 1289. We believe that the operative language of the current statute is, if anything, broader than the previous language applied in McKie and Xavier in that the concept of possession is expanded. Further, it is coupled with other verbs that could apply here as well -- "has, . . . bears, transports or carries."

Crispin relies on United States v. Chairez, 33 F.3d 823 (7th Cir. 1994), to support his argument that there was insufficient evidence to convict him of possession of a firearm. However, Chairez is readily distinguishable. First, the court was only considering whether the defendant "possessed" a gun as required by the portion of the statute at issue, 18 U.S.C. S 924(c). The court opined that "[a] defendant must know of the firearm's existence in order to have possession or control of it." Chairez , 33 F.3d at 825. Chairez was sitting in the passenger seat of a car containing marijuana. Id. at 824. After the police and DEA agents stopped the car and had the driver and passenger get out, they discovered a gun six inches under the passenger seat. Id. Chairez successfully appealed his conviction for possessing a firearm in connection with a drug trafficking offense by demonstrating that there was insufficient evidence that he knowingly possessed the gun. Id. at 825. The court found that the government"failed to produce even a shred of evidence" that Chairez knew about the gun or had ever carried a firearm. Id. Here, Crispin's knowledge is well established in the record based on Pemberton's testimony that Crispin told him that the gun was under the seat.

Clearly, the jury could have rationally found that the government established that Crispin "had, possessed, bor[e], transported, or carried" the firearm beyond a reasonable doubt. Thus, we reject Crispin's claim that there is insufficient evidence to support his conviction for possession of a firearm.

22

H. Failure to Question Juror Regarding Possible Bias

Navarro argues that the District Court erred by not questioning a juror to ascertain if she was biased against him. The juror in question sent the judge a note on the fourth day of the trial, requesting that Navarro stop staring at her. The note said: "it doesn't bother me, he doesn't scare me, it's just that I don't like it." Id. On the following trial day, Navarro's counsel asked that the juror be stricken from the jury because she "harbor[ed] specific feelings toward Mr. Navarro [that are] negative." Id. The District Court denied the motion to strike the juror, stating: "[T]here is nothing I have heard that would allow me to conclude that this particular [juror] is necessarily harboring feelings of negativity towards the defendant Navarro." 12 On appeal, Navarro argues that the note shows that the juror was biased toward him, and that the Court should have questioned the juror in order to explore the issue before making this determination. We review the District Court's handling of this matter under an abuse of discretion standard. See United States v. Murray, 103 F.3d 310, 323 (3d Cir. 1997) ("We review the district court's ruling [not to excuse a juror for cause] for an abuse of discretion.")

Navarro relies on Gov't of the Virgin Islands v. Dowling, 814 F.2d 134 (3d Cir. 1987), to support his contention. In Dowling, the trial judge received a note from a juror indicating that the jury had been exposed to extra-record information about the facts of the case and about Dowling's past criminal record. Id. at 135. The note identified one specific juror as the one who was discussing these matters. Id. at 136. The judge excused the juror identified in the note, id. at 136, but denied the defendant's motion for a mistrial after addressing the entire jury panel, none of whom indicated that they had been exposed to any information that "had rendered [him or her] incapable of giving a fair trial." Id. at 135. We held that the failure to question the jurors individually was not an abuse of

_____

12. While the actual transcript reads that the Court referenced "this particular defendant" rather than "this particular juror," the context of the Court's statement makes clear that it intended to speak of the juror rather than the defendant.

23

discretion, but we reversed on the grounds that"the trial judge erred when he failed to develop a record sufficient to permit evaluation of the potential prejudice to the defendant and failed to make a finding regarding the jurors' ability to perform their assigned task which took into account whatever information they had received." Id. at 141.

While Dowling does support Navarro's argument that in camera questioning of an individual juror is appropriate in some instances to determine prejudice, its reasoning focused on juror exposure to prejudicial extra-record information. While there may be circumstances which would warrant an extension of Dowling, we find that Dowling does not apply to the facts of this case. Here, the judge had obviously observed the defendant and the proceedings and was not confronted with the exertion of an outside influence.13 While the judge might have questioned the juror, the note states that the juror was not bothered by Navarro's alleged conduct, giving rise to a clear inference that she was not negatively affected by it. Dowling also stands for the proposition that the trial judge must be given considerable latitude when making such decisions, as "the trial judge develops a relationship with the jury during the course of a trial that places him or her in a far better position than an appellate court to measure what a given situation requires." Id. at 137.

In addition, our reasoning in United States v. Murray, 103 F.3d 310 (3d Cir. 1997), though involving somewhat different facts, provides additional support for the District Court's conclusion. Murray involved a challenge to a District Court's denial of a motion to disqualify a juror (during jury selection) because he disclosed during voir dire that he had read an article regarding the case. Id. at 322. In affirming the District Court, we stated:

_____

13. While not necessarily determinative, we do note that under the Federal Rules of Evidence, extraneous information is viewed as posing a unique threat to the deliberative process. Pursuant to Rule 606(b), a juror may not testify about the jury's deliberations, except in regards to "extraneous prejudicial information . . . improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

24

> In determining whether a particular juror should be excused for cause, our main concern is whether the juror holds a particular belief or opinion that will prevent or substantially impair the performance of his duties as a juror . . . . Determining whether a prospective juror can render a fair verdict lies peculiarly within a trial judge's province . . . . The trial judge's resolution of such questions is entitled, even on direct appeal, to special deference.

Id. at 323 (internal quotation marks and citations omitted). The District Court here made an assessment of the situation as required by Murray. We see nothing in the record here to indicate that the District Court should have concluded that the juror in question was incapable of "render[ing] a fair verdict," or that it was obligated to question the juror in order to make that determination. See id.; see also United States v. Hursh, 217 F.3d 761, 768-69 (9th Cir. 2000) (holding that though judge did not question juror individually, note from juror to judge requesting private meeting to ask legal question did not suggest juror would not base verdict on evidence). Accordingly, we find that the District Court's decision not to question the juror before ruling on Navarro's motion to strike was well within its discretion.

IV. CONCLUSION

For all the foregoing reasons, we will AFFIRM the District Court's Judgment and Conviction Orders.

25

McKEE, Circuit Judge, concurring.

I join the opinion of my colleagues in all respects, but write separately to express my concern over the carjacking convictions under 18 U.S.C. S 2119. See Maj. Op. at 18-19. Although I agree that United States v. Lake 150 F.3d 269, 272 (3d Cir. 1998), requires that we affirm the instant convictions for carjacking, I continue to believe that Lake was wrongly decided. Here, as in Lake, the temporal and circumstantial nexus between the theft of the keys and the subsequent theft of the car is just too attenuated to constitute the federal offense of "carjacking." In his thoughtful dissent in Lake, Chief Judge Becker explained why such an attenuated nexus ought not to establish the federal crime of carjacking. He explained:

> When the defendant took the car keys from his victim, . . . [the victim's] car was, in city terms, a block away up the hill, out of sight. Under these circumstances, I would join an opinion upholding Lake's conviction for keyjacking, or for both key robbery and grand larceny. I cannot however agree that he is guilty of carjacking.

150 F.3d at 275 (Becker, C.J. dissenting) (internal quotation marks omitted). I agree. Although here, the car was closer to the keys than the car that was taken in Lake, the theft of the keys, and the theft of the car are still two discrete actions separated by both time and distance.

Accordingly, but for Lake, I would conclude that the evidence here is not sufficient to establish that the vehicle was taken "from the person or presence of another" as is required for a conviction under 18 U.S.C. S 2119. However, inasmuch as we are bound by the holding in Lake , I join in the analysis of my colleagues. Under Lake, I must agree that the evidence presented here is sufficient to morph this "keyjacking," into a carjacking under S 2119.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit

26